

# In the
# Missouri Court of Appeals
# Western District

IN THE MATTER OF KANSAS CITY
POWER & LIGHT COMPANY'S
REQUEST FOR AUTHORITY TO
IMPLEMENT A GENERAL RATE
INCREASE FOR ELECTRIC
SERVICE,

        Appellant,

and

MIDWEST ENERGY CONSUMERS'
GROUP,

        Appellant,

v.

MISSOURI PUBLIC SERVICE
COMMISSION,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

WD79125 Consolidated with
WD79143 and WD79189

OPINION FILED: September 6, 2016

### Appeal from the Public Service Commission

Before Division Two: Karen King Mitchell, Presiding Judge, Cynthia L. Martin, Judge
and Gary D. Witt, Judge

This case consolidates two appeals from a rate case involving Kansas City Power

& Light Company's ("KCPL") request for a rate increase from the Public Service

Commission ("PSC"). KCPL appeals from the Report and Order ("Report and Order") of the PSC in its most recent general rate case, pursuant to Section 386.510.[1] KCPL raises five points on appeal, challenging the return on equity granted by the PSC, the methods used to calculate that rate of return, the rejection of a "tracker" accounting mechanism, the PSC's refusal to include certain transmission costs in a fuel adjustment clause, and the denial of certain rate case expenses. We affirm the PSC's Report and Order.

Midwest Energy Consumers' Group ("MECG") is an unincorporated association that is comprised of large consumers of energy, which was permitted to intervene in KCPL's rate case. MECG appeals from the Compliance Tariff Order, which implemented the Report and Order. MECG raises seven points of error, each challenging the September 16 Compliance Tariff Order that concluded the Final Compliance Tariff sheets filed by KCPL complied with the PSC's September 2 Report and Order. Each point of error challenges the process and procedure by which the PSC issued its Compliance Tariff Order. MECG's appeal is dismissed as moot.

## Factual Background

KCPL is a regulated public utility under the jurisdiction of the PSC of the State of Missouri under Chapters 386 and 393. The PSC is charged with the authority to set the rates that KCPL is allowed to charge consumers pursuant to section 393.150. On October 30, 2014, KCPL filed tariff sheets that would implement a general rate increase for its retail electric utility service. KCPL requested an increase on its return on equity

---

[1] All statutory references are to the Revised Statutes of Missouri 2000 as currently supplemented, unless otherwise indicated.

from 9.7% to 10.3%. In addition, KCPL asked the PSC to adopt a fuel adjustment clause under section 386.266 and to use an accounting deferral mechanism for certain items of expenditure.

The implementation of the new tariffs was suspended until September 29, 2015 to allow for full rate case proceedings. A number of parties intervened and participated in the proceedings, including MECG. A test year of twelve months, ending on March 31, 2014 and extended to December 31, 2014, was agreed to by the parties and adopted by the PSC. The PSC also established a "true-up" period to run through May 31, 2015. Public hearings were conducted and evidentiary hearings were held over a number of days. The parties filed post-hearing briefs and the case was submitted to the PSC on August 3, 2015.

In its Report and Order, the PSC set KCPL's return on equity to 9.5%. The PSC denied KCPL's request for an accounting deferral mechanism known as a "tracker" for certain expenses. The PSC permitted KCPL to implement a fuel adjustment clause, but only for "true" purchased power, approximately 7.3% of the costs charged to KCPL by the Southwest Power Pool. Finally, the PSC allowed KCPL to recover approximately 74.26% of its expenses on the rate case. Timely applications for rehearing were filed and denied.

This appeal follows. Further details regarding the relevant disputed issues are outlined as applicable in the analysis sections of each point below.

3

## Standard of Review

An order from the PSC is presumed to be valid, and the burden of proof is on the party challenging the order, by clear and satisfactory evidence, to show that the order is either unlawful or unreasonable. *See In re Laclede Gas Co.*, 417 S.W.3d 815, 819 (Mo. App. W.D. 2014); Section 386.430.

Judicial review of the PSC's Report and Order is two-fold. *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 397 S.W.3d 441, 446 (Mo. App. W.D. 2013). First, we must determine whether the PSC's order was lawful. *Id.*

> An order's lawfulness depends on whether the [PSC's] order and decision was statutorily authorized. When determining whether the order is lawful, we exercise independent judgment and must correct erroneous interpretations of the law. Because the [PSC] is purely a creature of statute, its powers are limited to those conferred by statute either expressly, or by clear implication as necessary to carry out the powers specifically granted.

*Id.* at 446-47 (internal quotations and citations omitted). "Second, we must determine whether the [PSC's] order was reasonable." *Id.* at 447. "In determining whether the Commission's order is reasonable, we consider (1) whether it was support[ed] by substantial and competent evidence on the whole record, (2) whether the decision was arbitrary, capricious, or unreasonable, and (3) whether the [PSC] abused its discretion." *Id.* (internal quotations and footnote omitted).

> "We consider the evidence, along with all reasonable supporting inferences, in the light most favorable to the Commission's order. [*State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n*, 186 S.W.3d 376, 382 (Mo. App. W.D. 2005).] "[I]f substantial evidence supports either of two conflicting factual conclusions, '[we are] bound by the findings of the administrative tribunal.'" *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 120 S.W.3d 732, 735 (Mo. banc 2003) (quoting *Amway Corp. v. Dir. of Revenue*, 794 S.W.2d 666, 668 (Mo. banc 1990)). The

determination of witness credibility is left to the Commission, "'which is free to believe none, part, or all of the testimony.'" *Mo. Gas Energy*, 186 S.W.3d at 382 (quoting *Commerce Bank, N.A. v. Blasdel*, 141 S.W.3d 434, 456–57 n.19 (Mo. App. W.D. 2004)). "It is only where a Commission order is clearly contrary to the overwhelming weight of the evidence that we may set it aside." *Id.* Additionally, with regard to issues within the Commission's expertise, "we will not substitute our judgment for that of the Commission." [*Union Elec. Co. v. Pub. Serv. Comm'n*, 136 S.W.3d 146, 151 (Mo. App. W.D. 2004)].

*State ex rel. Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 289 S.W.3d 240, 246-47 (Mo. App. W.D. 2009).

## Appeal by Kansas City Power & Light Company

## Analysis

## Point One - Return on Equity

In KCPL's Point One on appeal, KCPL argues the PSC erred in choosing a return on equity ("ROE") of 9.5% and in refusing regulatory treatment that recognizes certain known future cost increases because the impact of these determinations is unreasonable and unlawful as it is confiscatory.

The Supreme Court has decided that a public utility, as a matter of constitutional right,

> is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding[] risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

*Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 692-93 (1923). "A rate of return is generally considered to be fair if it covers utility operating expenses, debt service, and dividends, if it compensates investors for the risks of investment, and if it is sufficient to attract capital and assure confidence in the enterprise's financial integrity." *State ex rel. Mo. Gas Energy*, 186 S.W.3d at 383 (internal quotation omitted); *see also Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944).

In Missouri, section 393.270.4 governs, in part, the PSC's authority to fix utility rates, and states the following:

> In determining the price to be charged for gas, electricity, or water the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable average return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies.

"The rate of return is, essentially, the amount that a utility must pay to secure financing from debt and equity investors." *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 274 S.W.3d 569, 573 (Mo. App. W.D. 2009). "To determine the proper rate of return, the commission should factor '(i) the ratio of debt and equity to total capital, and (ii) the cost and (iii) weighted cost for each of these capital components.'" *Id.* at 573-74 (quoting *State ex rel. Mo. Gas Energy*, 186 S.W.3d at 383).

"Determining a rate of return on equity, however, is imprecise and involves balancing a utility's need to compensate investors against its need to keep prices low for

6

consumers." *Id.* at 574. Missouri courts have consistently held that the PSC is not required to utilize any specific methodology to calculate a just and reasonable return in setting rates. *State ex rel. Praxair, Inc. v. Pub. Serv. Comm'n,* 328 S.W.3d 329, 339 (Mo. App. W.D. 2010). This Court has outlined the following principles governing review of the PSC's determination of an ROE.

> The Commission has considerable discretion in rate setting due to the inherent complexities involved in the rate setting process. *State ex rel. Associated Natural Gas Co. v. Public Serv. Comm'n,* 706 S.W.2d 870 (Mo.App.1985). It is not the theory or methodology, but the impact of the rate order which counts. *State ex rel. Missouri Water Co. v. Public Serv. Comm'n,* 308 S.W.2d 704, 714 (Mo.1957). Missouri courts do not set utility rates. *State ex rel. GTE North, Inc. v. Missouri Pub. Serv. Comm'n,* 835 S.W.2d 356, 361 (Mo.App.1992). "If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." *Associated Natural Gas,* 706 S.W.2d at 873 (quoting *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 602–03, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944)). Where ratemaking is at issue, determinations by the Commission are favored by a presumption of validity.

*State ex rel. Office of the Pub. Counsel v. Pub. Serv. Comm'n,* 938 S.W.2d 339, 344 (Mo. App. W.D. 1997).

The PSC set KCPL's ROE at 9.5%, down from the previous return on equity of 9.7%. KCPL had requested a new return on equity rate at somewhere between 9.7% and 10.3%. There is not a single way to determine a proper ROE. Therefore, analysts utilize three generally accepted methods to estimate a fair ROE: the Discount Cash Flow Method ("DCF"), the Risk Premium Method, and the Capital Asset Pricing Method

7

("CAPM").[2] Analysts generally balance their use of all three methods to determine a recommended ROE.

Four expert witnesses testified as to their opinions regarding the ROE. One witness, Robert Hevert ("Hevert"), offered testimony on behalf of KCPL. He recommended an ROE of 10.3%, within a range of 10.0% to 10.6%. The PSC determined that Hevert's estimate was too high. The PSC found Hevert's (1) constant growth DCF results were based on excessive and unsustainable long-term growth rates, (2) multi-stage DCF was based on a flawed accelerating dividend cash flow timing and an inflated gross domestic product growth estimate as a proxy for long-term sustainable growth, (3) CAPM was based on inflated market risk premiums, and (4) bond yield plus risk premium was based on inflated equity risk premiums.

Michael Gorman ("Gorman") testified on behalf of the Missouri Industrial Energy Consumers and MECG. He testified that based on returns on equity awarded by other commissions, a reasonable ROE for KCPL would be 9.5% or less. He recommended an ROE of 9.1% within a range of 8.8% and 9.4%. Maureen Reno ("Reno") offered testimony on behalf of the U.S. Department of Energy and the Federal Executive Agencies and recommended an ROE of 9.0% within a recommended range of 8.2% and 9.6%. Finally, Zephania Marevangepo ("Marevangepo") offered testimony on behalf of

---

[2] The DCF method assumes that a stock's current price accurately represents the present value of all expected future cash flows for the utility. The Risk Premium method assumes that investors require a higher return to assume a greater risk. Generally, common equity investments have greater risk than bonds because bonds have more security for payment in bankruptcy proceedings than common equity. The CAPM assumes that the investor's required ROE is equal to a risk-free rate of interest plus the product of a company-specific risk factor and the expected risk premium on the market portfolio.

8

the technical staff of the PSC. She recommended an ROE of 9.25% within range of 9.0% and 9.5%.

The PSC found the estimates from Gorman, Reno, and Marevangepo were reasonable and accurate estimates of the current market cost of capital for KCPL. The upper ends of the recommendations from these three analysts were 9.4% to 9.6%. The PSC concluded that these recommendations relied on verifiable and independent market data and accepted market-based rate of return models. The PSC also considered a number of additional factors, including recent indicators of growth and the reduction of risk to KCPL by the PSC's approval of a fuel adjustment clause, which would support a reduced return. KCPL found that an ROE of 9.5% would allow KCPL to compete in the capital market for funds needed to maintain its financial health.

To further justify its chosen ROE of 9.5%, the PSC found that, in general, state public utility commissions are reducing authorized returns on equity to follow declines in capital market costs. The PSC looked at industry authorized returns on equity for fully litigated cases, which in 2014 was 9.63% and in the first quarter of 2015 was 9.57%. The PSC uses these comparisons because KCPL must compete with other utilities in the country for the same capital. Since the last established ROE of 9.70%, the PSC found that market capital costs for Missouri electric utilities are lower as a result of increases in stock prices and decreases in bond yields and utility dividend yields. In addition, since April of 2015, capital markets and general economic indicators have indicated expanding macroeconomic growth and increasing returns.

KCPL, on the other hand, argues that the PSC made its decision contrary to evidence of a consistent pattern of KCPL earning below its authorized ROE. KCPL presented evidence that U.S. regulatory commissions were approving ROEs that averaged 9.83% during the second quarter of 2015. KCPL also argued that it has a riskier profile than most other U.S. utilities that would justify a higher ROE. KCPL takes issue with the approach taken by the PSC to determine the ROE by relying on historical costs to set rates. KCPL argues that the PSC's reliance on historical data will fail to reflect KCPL's current expenses when the new rates take effect, which KCPL claims will be higher than historical costs indicate due to a number of factors, a phenomenon called "regulatory lag."

The PSC counters that its approach to calculating the ROE strikes the appropriate balance between considering historical costs in setting the ROE and looking at future variables. The test year is the primary mechanism through which the PSC determines appropriate rates. The PSC focuses on four factors during the test year: (1) the rate of return the utility has an opportunity to earn; (2) the rate base upon which a return may be earned; (3) the depreciation costs of plant and equipment; and (4) allowable operating expenses. These factors are considered to determine the utility's revenue requirement, which is the amount of revenue taxpayers must generate to pay the costs of producing the utility's services they receive while yielding a reasonable rate of return. The PSC's use of a true-up audit and hearing is designed to balance the historical data with known and measureable subsequent and future changes; these are generally limited only to accounts affected by a significant known and measurable change, such as a new labor contract,

10

new tax rate, or the completion of a new capital asset. This procedure is designed to reduce regulatory lag.

This Court's role is not to determine what a reasonable ROE is but rather to review the record to see if the PSC's decision is lawful and supported by competent and substantial evidence. *State ex rel. Pub. Counsel*, 397 S.W.3d at 447. We must defer to the Commission's decisions regarding the credibility of witnesses and not second-guess issues that are within the PSC's area of expertise. *See State ex rel. Pub. Counsel*, 289 S.W.3d at 247.

> Evaluation of expert testimony is left to the Commission which "may adopt or reject any or all of any witnesses' testimony." *State ex rel. Associated Natural Gas Co. v. Public Service Comm'n*, 706 S.W.2d 870, 880 (Mo. App. W.D. 1985). Since the testimony of both experts was properly presented to the Commission, it was up to the Commission to choose between the conflicting evidence presented as to the propriety of including the cost of the storage gas in the new rate calculations.

*State ex rel. Associated Nat. Gas Co. v. Pub. Serv. Comm'n*, 37 S.W.3d 287, 294 (Mo. App. W.D. 2000).

We find that the decision of the PSC was lawful and supported by competent and substantial evidence. First, three experts each testified credibly, as found by the PSC, as to an appropriate ROE. The chosen ROE of 9.5% was within the ranges of the recommendations of these three experts. The PSC found the testimony of expert Gorman credible that an ROE as low as 9.1% would maintain KCPL's financial integrity and ability to attract capital. Gorman's analysis included an evaluation of the risks and uncertainties faced by utilities comparable to KCPL, thus complying with the Supreme Court's guidance in *Bluefield. See Bluefield Waterworks*, 262 U.S. at 692. Further, the

11

PSC determined that an ROE of 9.5% was close to the average of comparable utilities, which in 2014 was 9.63% and in the first quarter of 2015 was 9.57%. This Court has previously approved a "zone of reasonableness" established by the PSC that considered a return on equity within 100 basis points (i.e. 1.0% above or below) the national average as presumptively reasonable. *See State ex rel. Pub. Counsel*, 274 S.W.3d at 574; *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968)("courts are without authority to set aside any rate selected by the Commission [that] is within a 'zone of reasonableness'"). Here, the zone of reasonableness within the national average, as found by the PSC, is 8.63% to 10.63%. An ROE of 9.5% falls squarely within the zone of reasonableness. Also, we have held that where the ROE falls within the range recommended by the expert witnesses and is in keeping with the average for other similarly situated entities, in the absence of any other significant showing that the figure established is unreasonable, this Court must defer to the PSC. *See State ex rel. Noranda Aluminum, Inc. v. Pub. Serv. Comm'n*, 356 S.W.3d 293, 311 (Mo. App. S.D. 2011).

Although KCPL complains that the PSC only looked to "fully-litigated" cases rather than to all other rate cases to determine comparable returns on equity, KCPL has cited no authority that would suggest the PSC's reliance on fully-litigated cases is improper. Our role is not to second-guess issues that are within the PSC's area of expertise and we will not do so here. *See State ex rel. Pub. Counsel*, 289 S.W.3d at 246-47. KCPL relies extensively on past actual returns on equity to argue reducing its ROE here is unreasonable, but such comparisons are only of limited value as the PSC cannot compensate KCPL for previous unearned equity but may only use that information in its

calculations of a reasonable return going forward. *See State ex rel. Mo. Gas Energy*, 186 S.W.3d at 383 (the law does not require that rates yield any particular return and past losses are not considered in deciding whether a new rate is confiscatory).

Second, although KCPL complains that the historical test-year model with a true-up period does not adequately take into account regulatory lag, the PSC has adapted its methodology to attempt to account for regulatory lag. The true-up period established by the PSC was designed to remediate some of the negative effects of regulatory lag by taking into account known and measurable subsequent or future changes to KCPL's expenses. Again, the PSC is not obligated to use any set methodology in making its ROE determinations but must exercise its considerable discretion and expertise in finding an ROE that is just and reasonable. *See State ex rel. Praxair, Inc.*, 328 S.W.3d at 339. Determinations of the PSC have the presumption of validity that will not be upended for the sole reasons that KCPL believes it has a better way to calculate an ROE. *Id.* ("Where ratemaking is at issue, determinations by the [PSC] are favored by a presumption of validity.") The best way to account for regulatory lag is a question of methodology and is best addressed by the expertise of the PSC, which this Court will not second-guess. *See State ex rel. Pub. Counsel*, 289 S.W.3d at 246-47.

We find that KCPL's chosen return on equity was lawful and supported by substantial and competent evidence. Point One is denied.

### Points Two and Three - Tracking Mechanisms and Forecasts

KCPL's claims in Points Two and Three on appeal are largely intertwined and, therefore, will be considered together. In its case in chief and in direct testimony, KCPL

13

requested that the PSC grant it the use of tracking mechanisms[3] for expenses related to certain transmission fee expenses, property tax expenses, and CIP/cyber-security expenses. In sur-rebuttal testimony, KCPL suggested, in the alternative to the requested tracking mechanisms for these expenses, in the event those mechanisms were denied by the PSC, that its estimates of future expenses regarding the above categories be added to the figures from which the PSC calculates KCPL's revenue requirements.

The PSC denied KCPL's request to use tracking mechanisms as to each of these categories of expenses. This is the subject of KCPL's Point Three on appeal, considered first, in which KCPL claims the PSC erred in denying its request for a "tracker" accounting deferral mechanism because the legal conclusion by the PSC that only "extraordinary" items could be deferred as regulatory assets is unlawful and unreasonable because it is contrary to the Uniform System of Accounts ("USOA"), adopted by the PSC, because the USOA does not require that revenues, expenses, gains or losses be "extraordinary" in order to be deferred as a regulatory asset or liability.

The PSC has the power, pursuant to section 393.140(4), to prescribe uniform methods of keeping accounts. The PSC has adopted a rule that requires utilities to use the USOA to maintain their books and records. *See* 4 CSR 240-20.030. KCPL's arguments regarding the USOA and its alleged right to use a tracking accounting deferral mechanism completely ignore that the PSC's decision that only extraordinary expenses should be allowed such treatment is a policy decision that has been made by the PSC and

---

[3] For the purposes of this discussion, the "tracking mechanism" we refer to is an accounting deferral mechanism that re-characterizes an income statement item ("revenues, expenses, gains, or losses") in a current period as a balance sheet item ("regulatory assets" or "regulatory liabilities") that would be addressed in a future rate proceeding.

14

is not dictated by whether, in the abstract, the USOA provides a mechanism to defer costs, whatever the type. The PSC has decided that the "use of trackers should be limited because they violate the matching principle, tend to unreasonably skew ratemaking results, and dull the incentives a utility has to operate efficiently and productively under the rate regulation approach employed in Missouri." The manager of the PSC's auditing unit testified that the PSC will issue accounting authority orders ("AAOs"), which serve to allow a utility to deviate the normal method of accounting for certain expenses, most often associated with "extraordinary" events. The request by KCPL for the "tracking" accounting mechanism is the same as a request for an AAO, as it seeks to book a particular cost, normally charged as an expense on a utility's income statement in the current period, to the utility's balance sheet as a regulatory asset or regulatory liability. The manager testified that the PSC

> in prior cases has stated that the standards for granting the authority to a utility to defer costs incurred outside of a test year as a regulatory asset are: 1) that the costs pertain to an event that is extraordinary, unusual and unique, and not recurring; and 2) that the costs associated with the event are material.

In deciding that only extraordinary costs qualify for deferral, the PSC has followed the USOA's guidance that "it is the intent that net income shall reflect all items of profit and loss during the period." 18 CFR Part 101, General Instruction 7. An exception to this general rule is for "extraordinary items" as defined by the USOA.

KCPL makes an exceedingly perplexing argument that because USOA's Definition 31, which defines "Regulatory Assets and Liabilities," includes no requirement

15

that items so categorized must qualify as "extraordinary," then KCPL must be allowed deferral treatment for certain of its expenses. Definition 31 states in full:

> Regulatory Assets and Liabilities are assets and liabilities that result from rate actions of regulatory agencies. Regulatory assets and liabilities arise from specific revenues, expenses, gains, or losses that would have been included in net income determination in one period under the general requirements of the Uniform System of Accounts but for it being probable:
>
> A. that such items will be included in a different period(s) for purposes of developing the rates the utility is authorized to charge for its utility services; or
>
> B. in the case of regulatory liabilities, that refunds to customers, not provided for in other accounts, will be required.

18 CFR Part 10. This definition, relied upon by KCPL, provides no support for KCPL's argument that it *must* be allowed to defer any expense of its choosing. The definition recognizes that certain expenses that would normally be included in net income for one period may become a regulatory asset or liability if it is probable that the item would be included in a different period for purposes of developing the rates the utility is authorized to charge for its services. The PSC, however, remains the authority that determines when an item may be included in a different accounting period for the purpose of developing authorized rates. The PSC has followed the guidance in 18 CFR Part 101, General Instruction 7, that costs should not be deferred to another accounting period except for "extraordinary items."

The PSC is granted wide discretion in determining the methodology it chooses to determine an ROE. *State ex rel. Office of the Pub. Counsel*, 938 S.W.2d at 344; *State ex rel. Praxair, Inc.*, 328 S.W.3d at 339. The PSC has historically utilized the test year and

16

true-up procedure to determine appropriate future rates because the historical test year's expenses can be used to determine reasonable future rates. *See e.g., State ex rel. Noranda Aluminum, Inc.*, 356 S.W.3d at 318 ("Past expenses are used as a basis for determining what rate is reasonable to be charged in the future in order to avoid further excess profits or future losses [ . . . . ]") The PSC also utilizes a true-up audit and hearing, which adjusts the historical test year figures for known and measurable subsequent or future changes. *See State ex rel. Mo. Pub. Serv. Co. v. Fraas*, 627 S.W.2d 882, 888 (Mo. App. W.D. 1981) (discussing the PSC's use of "a modified version of the projected year model by utilizing a test year which was adjusted to take into account known and measurable future changes. That concept was implemented by the holding of what the Commission denominates as 'a true-up hearing.'") Whether a cost should be afforded different treatment and merits a deferral directly impacts the PSC's chosen methodology for setting rates and is necessarily a discretionary judgment that is within the expertise of the PSC and not this Court. Which costs a utility is able to defer would impact the PSC's chosen method to determine rates and is a matter properly confined to the PSC's expertise. As such, we will not second-guess the PSC's reasoned decision that only extraordinary items may qualify for deferral treatment.[4] *See State ex rel. Pub. Counsel*, 289 S.W.3d at 246-47 (this Court must defer to the PSC on issues within its expertise).

Accordingly, Point Three is denied.

---

[4] It is unnecessary for this Court to decide whether, as argued by MECG, the use of a tracker accounting mechanism would constitute retroactive ratemaking.

17

In Point Two on appeal, KCPL argues the PSC erred in rejecting KCPL's request that trending principles and forecasts be considered in setting future rates because Missouri law prohibits the PSC from relying exclusively on historical expenses and ignoring relevant substantial and competent evidence that for the period covered by the new rates there will be new and significant mandatory cost increases for critical infrastructure protection ("CIP"), cyber-security, Southwest Power Pool transmission costs, and property taxes.

KCPL sought the approval to use a tracking mechanism for transmission expenses for the Southwest Power Pool ("SPP"), CIP and cybersecurity, and property taxes in its case-in-chief. In sur-rebuttal testimony, KCPL suggested, in the alternative to the requested tracking mechanism for these expenses, in the event this mechanism was denied by the PSC, that its estimates of future expenses regarding the above categories be added to the figures from which the PSC calculates KCPL's revenue requirements.

Regarding SPP transmission expenses, the PSC found that KCPL incurs fees as it sends and receives power though the SPP, a Regional Transmission Organization. The PSC found that these costs for KCPL have increased over the past several years, but that the projected fees would decrease in the future and constitute ordinary and recurring operating costs. Regarding cybersecurity and CIP costs, the PSC found that KCPL's cybersecurity and CIP costs were projected to increase primarily in 2015 and decrease for the following two years. Compliance costs would then be an ongoing cost for the foreseeable future. Finally, regarding the property tax expenses, KCPL found that even

18

though these costs had been and may continue to rise, those rates were included in normal operating costs and could be reasonably calculated on an annualized basis.

The PSC in its Report and Order, as explained *supra*, denied the use of a tracking mechanism for these expenses. In its Report and Order, the PSC also denied KCPL's request to add specific estimated future costs in the calculation of KCPL's revenue requirement. The PSC found the following with regard to each requested expense. First, the requests to add the projected future costs to KCPL's revenue requirement did not come until surrebuttal testimony and as such violated PSC Rule 4 CSR 240-2.130(7)(A), which requires that direct testimony "shall include all testimony and exhibits asserting and explaining that party's entire case-in-chief." The PSC found that KCPL's failure to include its estimates and requests in its case-in-chief prevented other parties from having a sufficient opportunity to conduct discovery or provide testimony on the matters. Second, the PSC found that KCPL failed to adequately explain how it arrived at its estimates and how the Commission has the legal authority to grant KCPL's requested relief.

In determining rates, the PSC may consider all facts that in its judgment have a bearing on the proper determination of rates. *See* Section 393.270.4; *State ex rel. Pub. Counsel*, 397 S.W.3d at 447-48. Relevant facts, of course, include forecasts of future costs. *See Fraas*, 627 S.W.2d at 886 ("the Commission must make an intelligent forecast with respect to the future period for which it is setting the rate; rate making is by necessity a predictive science").

19

The PSC was within its authority to reject the inclusion of the specific amounts requested by KCPL for these projected costs in calculating KCPL's revenue requirement, as the requests were made for the first time in surrebuttal. Section 386.410 grants to the PSC the power to adopt and prescribe the rules governing its hearing procedures. The PSC has adopted numerous rules and regulations governing its procedures, including 4 CSR 240-2.130. 4 CSR 240-2.130(7)(A) provides that party's direct testimony shall include "all testimony and exhibits asserting and explaining that party's entire case-in-chief." Most direct testimony is pre-filed with the PSC in advance of the hearing. *See* 4 CSR 240-2.130(7)-(9). These procedures are important due to the highly technical nature of the issues presented at the hearing, in that it affords other parties a reasonable opportunity to provide evidence in response. Therefore, supplementing direct testimony is generally not allowed. *See* 4 CSR 240-2.130(10). It is not disputed that KCPL, for the first time in surrebuttal, requested that its specific forecasted SPP transmission expenses, CIP/cyber-security costs, and property taxes be included in its revenue requirements. As found by the PSC, allowing KCPL to make this request for the first time in surrebuttal precluded other parties from conducting discovery on the issue and from presenting evidence to refute KCPL's allegations. The PSC had the authority to reject the projected costs in its calculations on this basis.

However, we reject KCPL's suggestion that, in refusing to include KCPL's specific forecasts of future costs into KCPL's revenue requirement, the PSC has abandoned its duty to take into account projections of KCPL's future costs when it set its ROE. Regarding the SPP transmission fees, the PSC adopted as credible the expenses and

20

revenues forecasted by expert Karen Lyons ("Lyons"), Utility Regulatory Auditor for the PSC. Lyons's testimony took into account that although KCPL's transmission costs have increased, the amount charged by SPP is projected to *decrease in the future*. Similarly, the PSC considered evidence regarding the projected costs of CIP/cyber-security through the testimony of PSC staff that the PSC found credible. Staff testified that although costs related to CIP and cyber-security would increase primarily in 2015, thereafter the costs would *decrease for the next two years*. Finally, with regard to property taxes, the PSC accepted testimony that although those taxes were projected to increase, the costs could be reasonably calculated and an annualized level included in expenses. The PSC did consider projected costs in its calculations when it set KCPL's rates, contrary to KCPL's allegation on appeal that the PSC relied *solely* on historical data.

Point Two is denied.

## Point Four - Transmission Expenses in Fuel Adjustment Clause

In Point Four on appeal, KCPL argues the PSC erred in denying KCPL the authority to use a fuel adjustment clause to recover certain transmission costs because it is unreasonable and unlawful as contrary to the Filed Rate Doctrine and the United States Constitution's Supremacy Clause in that the PSC's decision ignores that KCPL's transmission costs are set by a federal tariff approved by the Federal Energy Regulatory Commission ("FERC") and the PSC's order improperly causes its FERC-approved costs to be trapped and unrecoverable.

KCPL requested, and was granted, the implementation of a fuel adjustment clause ("FAC") in its new rates. An FAC is a statutory mechanism that allows for periodic rate

21

adjustments, outside of a general rate case, to reflect decreases and increases in a utility's incurred fuel and purchased power costs. *See State ex rel. Union Elec. Co. v. Pub. Serv. Comm'n*, 399 S.W.3d 467, 482-83 (Mo. App. W.D. 2013). KCPL is a member of SPP, which is a regional transmission organization. KCPL sells all of the power it generates into the SPP market and purchases back from SPP 100% of the electricity it sells to customers. KCPL requested the authority to include all of its wholesale transmission expenses and revenues into its FAC. The PSC allowed only transmission expenses for "true" purchased power to be recovered through the FAC and those related only to off-system sales. KCPL was denied the inclusion in the FAC of costs related to: (a) scheduling the external and internal movement of power over the transmission system; (b) upgrading and maintaining the transmission systems; and (c) fees charged by SPP and FERC to support their operations.

Section 386.266 provides the PSC with the authority to approve an FAC. That section provides that

> any electrical corporation may make an application to the commission to approve rate schedules authorizing an interim energy charge, or periodic rate adjustments outside of general rate proceedings *to reflect increases and decreases in its prudently incurred fuel and purchased-power costs, including transportation.* The commission may, in accordance with existing law, include in such rate schedules features designed to provide the electrical corporation with incentives to improve the efficiency and cost-effectiveness of its fuel and purchased-power procurement activities.

Section 386.266.1 (emphasis added); *see also* 4 C.S.R. 240–20.090(1)(C).

> The regulation defines "fuel and purchased power costs" which must be considered in calculating a fuel adjustment. 4 CSR 240–20.090(1)(B). The definition varies depending upon whether off-system sales revenues and associated costs are "reflected" in the fuel adjustment clause. If off-system

22

sales revenues and associated costs are not reflected in the fuel adjustment clause, then "fuel and purchased power costs only reflect the prudently incurred fuel and purchased power costs necessary to serve the electric utility's Missouri retail customers." 4 CSR 240–20.090(1)(B)1. If off-system sales revenues and associated costs are reflected in the fuel adjustment mechanism, then "fuel and purchased power costs reflect both: (A) The prudently incurred fuel and purchased power costs necessary to serve the electric utility's Missouri retail customers; and (B) The prudently incurred fuel and purchased power costs associated with the electric utility's off-system sales." 4 CSR 240–20.090(1)(B)2.

*State ex rel. Union Elec. Co.*, 399 S.W.3d at 485.

The PSC found that the statute only allows the utility to use an FAC to recover transportation costs of "true" purchased power, which would not include power generated by KCPL, sold to SPP and then bought back from SPP, but only power purchased by KCPL that was not generated by KCPL. "True" purchased power, as defined by the PSC, amounts to approximately 7.3% of KCPL's wholesale transmission expenses. The PSC determined that the expenses incurred by KCPL to transmit its power from its own generation resources to its own load (approximately the remaining 92.7% of wholesale transmission expenses) are not for "purchased power" within the meaning of the statute.

KCPL *does not* challenge on appeal the PSC's interpretation of the statute. Rather, KCPL only argues that the PSC's refusal to allow KCPL to recover all of its transmission expenses and other costs associated with the SPP through the FAC runs afoul of the "Filed Rate Doctrine" and is contrary to the principles of federal preemption. In support of its argument, KCPL cites *State ex rel. Association National Gas Company v. Public Service Commission*, which explains that the Supremacy Clause "holds that interstate power rates fixed by the FERC must be given binding effect by state utility commissions

23

determining intrastate rates." 954 S.W.2d 520, 530-32 (Mo. App. W.D. 1997). KCPL also cites *Nantahala Power and Light Company v. Thornburg*, which explains that a "state utility commission setting retail prices must allow, as reasonable operating expenses, costs incurred as a result of paying a FERC-determined wholesale price." 476 U.S. 953, 965 (1986).

> This Court has explained the filed rated doctrine as follows:
>
> The federal preemption and filed rate doctrine invoked by KCP & L–GMO involves the relationship between the federal and state rate-setting authorities. FERC regulates the transmission and sale of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce; however, such regulation extends only to those matters that are not subject to regulation by the states. 16 USC § 824(a). "Because of the potential conflict between the federal and state rate-setting agencies, the 'filed rate doctrine' was developed as an outgrowth of straightforward principles of [f]ederal preemption and the Supremacy [C]lause." *Associated Natural Gas Co.*, 954 S.W.2d at 530 (citing *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 963, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986); *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)). The filed rate doctrine requires "that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates." *Nantahala*, 476 U.S. at 962, 106 S.Ct. 2349. The filed rate doctrine prohibits a state regulatory commission from "trapping" FERC-approved costs by preventing a distributor from fully recovering those costs from its retail customers. *Id.* at 970, 106 S.Ct. 2349.

*State ex rel. KCP&L Greater Mo. Operations Co. v. Mo. Pub. Serv. Comm'n*, 408 S.W.3d 153, 164 (Mo. App. W.D. 2013). "Trapping" of rates occurs where "costs under a FERC tariff are categorically excluded from consideration in retail rates" and the regulated entity "cannot fully recover its costs of purchasing at the FERC-approved rate." *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 48 (2003).

KCPL's reliance on this case law to argue that the PSC is required to allow KCPL to include all of its wholesale transmission expenses in an FAC is misplaced. The issue before this Court is not whether the PSC is required to permit KCPL to recover the full costs of FERC-approved tariff and rate schedules. It is clear that it is. Rather, the issue is whether KCPL is *entitled* to recover these costs *through an FAC* or whether the PSC has the discretion to allow some of the costs related to SPP be recovered through an FAC while including the remaining SPP costs in its decision determining general rates. KCPL has cited no authority whatsoever that it is entitled to use an FAC in the first instance. The FAC is merely a mechanism available, pursuant to Missouri statute, that helps address the volatility of transmission costs for the utility.

KCPL asserts that the PSC's "determination that 92.7% of future increases in [KCPL's] SPP transmission expenses can only be recovered in a general rate case amounts to a disallowance of the transmission expenses that it pays under the SPP tariff." Of course, this allegation is not a fact but rather another assertion by KCPL that the methods used by the PSC to determine appropriate rates are unsatisfactory. KCPL provides no support that it will be *foreclosed* from recovering its SPP fees through its general rates. The PSC had before it testimony to the contrary that

> [a]llowing KCPL to flow increases of [all of its] wholesale transmission expenses through an FAC would allow KCPL to recover the Missouri jurisdictional portion of these increases between base rate proceedings without considering whether KCPL has any offsetting changes in its non-transmission and non-fuel revenues and expenses. This could allow KCPL to over-recover its total costs.

25

The FAC is a creation of Missouri statute and not mandated by *Nantahala* or the Filed Rate Doctrine. Those cases and subsequent cases stand for the proposition that state utility commissions in setting retail rates "must allow, as reasonable operating expenses, costs incurred as a result of paying a FERC-determined wholesale price" and may not "conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable." *Nantahala*, 476 U.S. at 965-66. The PSC's conclusion that, pursuant to Missouri law, an FAC may only include transmission expenses for "true" purchased power and the remaining costs must be considered as other costs in setting the general rates does not run afoul of these principles. The *Nantahala* decision itself explains that there need not be a direct correlation between wholesale power prices and retail rates. *Id.* at 967-68. The *Nantahala* court agreed with the proposition that a state commission "may treat the proposed rate increase as it treats other filings ... and investigate the overall financial structure of [the power company] to determine whether the company has experienced savings in other areas which might offset the increased price." *Id.* (quoting *Narragansett Elec. Co. v. Burke*, 381 A.2d 1358, 1363 (R.I. 1977)).

Accordingly, we find that the PSC's decision to include only "true" purchased power transmission costs in the FAC does not run afoul of the Filed Rate Doctrine or the Supremacy Clause.

Point Four is denied.

### Point Five - Rate Case Expenses

In Point Five on appeal, KCPL argues the PSC erred in implementing a formula that disallowed over $270,000 in rate case expenses because this formula was

26

unreasonable and unlawful because the formula was an improperly adopted rule under section 536.021 and the PSC failed to find that any of these expenses were imprudent, but instead simply used a ratio of requested-to-award revenues as part of a new formula ostensibly developed for all Missouri utilities.

KCPL sought the recovery of rate case expenses from the PSC, which are the incremental costs incurred by the utility directly related to its application to change its general rate levels. KCPL's total rate case expense as of August 12, 2015 was $1,024,304. Staff of the PSC and the OPC alleged that certain expenses regarding expert witnesses and the costs of outside attorneys should be disallowed as they were imprudent. The PSC did not find any of the specific costs as imprudent because it determined that there is no "accessible appropriate standard for determining whether one consultant's analysis was truly unnecessary or if one attorney's expertise is worth more than another's." However, the PSC found that a significant portion of the expenses in this case were "driven primarily by issues raised by KCPL, which has complete control over the content and methodologies proposed in its rate cases." The PSC also found that KCPL has incurred rate case expenses "substantially higher than historical levels and higher than other utilities in Missouri." According to the PSC, this was because KCPL pursued issues in its case for the benefit of only shareholders, which are highly discretionary and "typically allocated entirely to shareholders." Therefore, the PSC decided that it was reasonable that KCPL shareholders cover a portion of KCPL's rate case expense. According to the PSC, it has the legal authority to apportion rate case expenses between

ratepayers and shareholders and it is appropriate to do so here where the inclusion of all the rate case expenses for payment by ratepayers would not be just and reasonable.

The PSC chose to use a formula in this case that would "directly link KCPL's recovery of rate expense to both the reasonableness of its issue positions and the dollar value sought from customers in this rate case." The PSC decided to link KCPL's percentage recovery of rate case expenses to the percentage of its rate increase request that the PSC found just and reasonable. The formula is expressed as follows: (Revenue Requirement Approved / Original Revenue Requirement Requested) x 100 = allowable percentage of rate case expense. Minus the costs of the depreciation study conducted by KCPL, which the PSC found should be fully allocated to ratepayers, the net rate case expense was $961,417. The PSC authorized the recovery of $713,907, representing a recovery of 74.26% of the rate case expenses.

KCPL raises two primary objections to the PSC's determination regarding rate case expenses. First, KCPL argues that in using this formula the PSC has participated in unlawful rulemaking. KCPL argues that the formula used by the PSC is a new policy of general applicability because it did not rely upon factual findings and a judgment on imprudence.

> "Whether an agency decision should be promulgated as a rule is a determination that is guided by section 536.010(6)...." *Dep't of Soc. Services, Div. of Med. Services v. Little Hills Healthcare, L.L.C.*, 236 S.W.3d 637, 641 (Mo. banc 2007). Section 536.010(6) of the act provides that the term "rule" means "each agency statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency [subject to certain exceptions]."

28

*Mo. Ass'n of Nurse Anesthetists, Inc. v. State Bd. of Registration for Healing Arts*, 343 S.W.3d 348, 356 (Mo. App. W.D. 2011). The PSC argues that it did not engage in improper rulemaking because the method devised to determine a just and reasonable inclusion of rate case expenses was tied to the facts of this case and was not a statement of general applicability.

The PSC found that this formula was appropriate for this case based on a number of factors. The PSC found the following:

> The evidence shows that the expenses in this case are driven primarily by issues raised by KCPL, which has complete control over the content and methodologies proposed when it files its rate cases. In this case, KCPL has requested three new trackers, two of which have never been requested before in Missouri. KCPL has also requested recovery in rates of the expenses from the Clean Charge Network, which is a type of expense that has never been raised in a rate case before this Commission. Each of these issues are unique to KCPL, and while KCPL always has the opportunity to pursue new and unique issues in a rate case, the decision to do so is entirely with[in] KCPL's power. In addition, KCPL has pursued some issues that only directly benefit shareholders, such as the La Cygne accounting authority and, of course, a higher ROE. In recent rate cases, KCPL has incurred rate case expenses substantially higher than historical levels and higher than other utilities in Missouri.

Further, the PSC explicitly recognized that the approach taken in this case is not applicable to all cases but is fact specific. The PSC explained

> It is understood that some of the issues litigated in this case do not directly affect the overall revenue requirement granted by the Commission; but it is also clear that the vast majority of the litigated issues do have a direct or indirect impact on the revenue requirement. Accordingly, percentage sharing is a reasonable approach to correlating recovery of rate case expense to the relationship between the amount of litigation that benefited both ratepayers and shareholders and that which benefitted only shareholders.

Contrary to KCPL's argument, the PSC clearly established that the formula was proper *in this case* due to the unique circumstances of this rate case and it was not announcing a new policy of general applicability to all utilities. Accordingly, we find that the PSC did not engage in improper rulemaking due to their specific findings, supported by the record, that KCPL's litigation strategy, which in large part inured to the benefit of shareholders rather than ratepayers, necessitates the use of this formula in this specific case to justly and reasonably allocate rate case expenses between KCPL's ratepayers and shareholders.

Second, KCPL argues the use of the formula is unlawful because it denied the recovery of rate case expenses without a specific finding that any of the expenditures were imprudent.

Section 393.130.1 provides that all charges demanded by a utility must be just and reasonable. The Missouri Supreme Court has found that within this power "necessarily includes the power and authority to determine what items are properly includable in a utility's operating expenses and to determine and decide what treatment should be accorded such expense items." *State ex rel. City of West Plains v. Pub. Serv. Comm'n*, 310 S.W.2d 925, 928 (Mo. banc 1958); *see also State ex rel. KCP&L Greater Mo. Operations Co.*, 408 S.W.3d at 162-66. "The PSC employs a 'prudence' standard to determine whether a utility's costs meet this statutory requirement." *State ex rel. KCP&L Greater Mo. Operations Co.*, 408 S.W.3d at 163 (citing *State ex rel. Associated Nat. Gas Co.*, 954 S.W.2d at 528).

The PSC has defined its prudence standard as follows:

30

[A] utility's costs are presumed to be prudently incurred.... However, the presumption does not survive "a showing of inefficiency or improvidence."

... [W]here some other participant in the proceeding creates a serious doubt as to the prudence of an expenditure, then the applicant has the burden of dispelling these doubts and proving the questioned expenditure to have been prudent. (Citations omitted).

*State ex rel. Associated Nat. Gas*, 954 S.W.2d at 528. The utility still has the burden of proof to show its expenses are just and reasonable. *Office of Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 409 S.W.3d 371, 376 (Mo. banc 2013).

In *State ex rel. KCP&L Greater Missouri Operations Company*, this Court considered the decision by the PSC that it would be unjust and unreasonable to require ratepayers to pay for the added transmission costs of electricity transmitted from a location in Mississippi, where KCPL could transport the electricity from Missouri for a lower price. 408 S.W.3d at 162. Even though the PSC found that the decision to include the Mississippi generation fleet in the utility's operations was prudent, the added transportation costs associated with transporting the electricity to Missouri were not. *Id.* at 162-63. We found that so long as the PSC determined that the expenditure was imprudent and that the imprudence would harm ratepayers, the denial of the recovery of that expenditure from ratepayers was lawful and reasonable. *Id.* at 163.

Regarding rate case expenses, the PSC recognized that rate cases are both beneficial to shareholders of a utility and also utility customers, but in different ways. Shareholders benefit from the rate case expenses as the costs are incurred to increase the utility's revenues and profitability. Customers benefit by having a healthy utility. In this

31

case, the PSC found that a standard prudency review of each expenditure in the rate case would not be possible and, even if conducted, would not provide a strong incentive for KCPL to impose cost controls because the utility holds all the information needed to identify imprudence. Therefore, the PSC did not identify any line item expense as explicitly imprudent, but rather found that the costs incurred by KCPL, as a whole, in pursuing its litigation strategy that in large part inured to the sole benefit of shareholders, were imprudent. An expert testified for the Staff of the PSC that, in similar contexts, highly discretionary costs that do not benefit customers, such as charitable donations, political lobbying expenses, and incentive compensation tied to earnings per share are typically allocated entirely to shareholders.

We will not say the PSC did not have the authority to determine that expenses incurred by KCPL for the sole benefit of its shareholders were imprudent such that it would be unjust and unreasonable to require ratepayers to bear the burden of those expenses. Here, where the PSC has found a certain category of expenditures imprudent, it would not make sense to require the PSC to do a line item review of the costs associated with the expenditure to determine whether each cost associated with KCPL's litigation strategy was imprudent. The majority of costs, for example, those related to infrastructure and transmission costs, are transparent and verifiable by the PSC. Rate case expenses are opaque, shielded from effective oversight by privilege and confidentiality. It would be an abdication of the PSC's responsibility to set just and reasonable rates to allow a utility to benefit from imprudently incurred litigation expenses. Serious doubt as to the prudency of KCPL's litigation strategy was raised by

32

the parties, and it was KCPL's burden to prove that its expenses (i.e. the expenses related to the litigation strategy found by the PSC to have been solely for the benefit of shareholders) were just and reasonable. KCPL does not argue on appeal that its litigation strategy was prudent but only that the remedy crafted by the PSC was not within its power. We find that the remedy crafted by the PSC was a reasonable exercise of the PSC's discretion and expertise in determining just and reasonable expenses to be borne by ratepayers.

Point Five is denied.

## Conclusion of KCPL Appeal

The Report and Order of the Public Service Commission is affirmed.

## Appeal by Midwest Energy Consumers' Group

KCPL initiated its rate case in October of 2014 by filing its proposed tariff sheets with the PSC. The proposed tariff sheets were scheduled to become effective thirty days after the filing on November 29, 2014. The PSC, however, suspended the effective dates for the proposed tariffs on November 5, 2015 for a period of 11 months to provide time to study the proposed rate increase, to hold hearings, and to determine if the proposed tariffs were just and reasonable.

MECG is an unincorporated association that is comprised of large consumers of energy, which was permitted to intervene in KCPL's rate case at a pre-hearing conference on November 24, 2014. At this same pre-hearing conference, it was established that the PSC would need to issue its Report and Order no later than September 2, 2015 in order to meet the September 29, 2015 effective date of the proposed tariffs. Evidentiary hearings

33

were held June 15-19, 29-30, and July 1 of 2015. MECG participated throughout the rate case. On August 3, 2015, after the submission of final briefs by the parties, the case was submitted for deliberation and decision to the PSC.

The PSC issued its Report and Order on September 2, 2015. The PSC rejected KCPL's proposed tariff sheets from October of 2014 and authorized KCPL to file tariff sheets that complied with the Report and Order no later than September 8, 2015. The PSC ordered its staff to file its recommendation regarding the approval of the compliance tariff sheets no later than September 14, 2015. The PSC also ordered any other parties to respond to the compliance tariff sheets no later than September 14, 2015. MECG *did not and is not* appealing the September 2, 2015 Report and Order. MECG appeals the September 16 Compliance Tariff Order, discussed *infra*.

KCPL filed its compliance tariff sheets on September 8, 2015. KCPL also filed a motion that requested expedited approval of the compliance tariff sheets in light of the thirty-days' notice and publication period required by section 393.140(11).[5] On September 14, the staff of the PSC filed its recommendation, supported by affidavits, to reject or suspend KCPL's compliance tariff sheets due to issues regarding language in the

---

[5] Section 393.140(11) states, in relevant part, the following:

> Unless the commission otherwise orders, *no change shall be made in any rate or charge*, or in any form of contract or agreement, or any rule or regulation relating to any rate, charge or service, or in any general privilege or facility, which shall have been filed and published by a gas corporation, electrical corporation, water corporation, or sewer corporation in compliance with an order or decision of the commission, *except after thirty days' notice to the commission and publication for thirty days as required by order of the commission*, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the change will go into effect. *The commission for good cause shown may allow changes* without requiring the thirty days' notice under such conditions as it may prescribe.

(emphasis added).

34

fuel adjustment clause tariff sheets. The following day, September 15, 2015, KCPL withdrew the contested fuel adjustment clause tariff sheets and filed new ones that addressed the PSC's concerns ("Final Compliance Tariffs"). Contemporaneously on September 15, the staff of the PSC and KCPL filed a joint motion for approval of all the compliance tariff sheets supported by affidavits of three staff members of the PSC.

Also on September 15, MECG filed its Objection to Tariffs, Objection to Affidavits and Request for Hearing. MECG objected to the Final Compliance Tariffs and the staff's pleading and affidavits that were used as evidentiary support for the PSC's decision to approve the Final Compliance Tariffs. MECG also requested a hearing to cross-examine the staff regarding the contents of their affidavits and to determine whether there was substantial and competent evidence to support the PSC's finding that the Final Compliance Tariffs complied with the Report and Order. On September 16, 2015, the PSC issued its Order Regarding Compliance Tariff Sheets ("Compliance Tariff Order") that concluded that the Final Compliance Tariffs were consistent with the Report and Order and were effective on September 29, 2015.

On September 29, 2015, the PSC issued its order denying MECG's Objections and Request for Hearing, finding that the matter was no longer a contested case. MECG filed its Application for Rehearing, which was denied.

On appeal, MECG raises seven points of error, each challenging the September 16 Compliance Tariff Order that concluded the Final Compliance Tariff sheets filed by KCPL complied with the PSC's September 2 Report and Order. Each point of error challenges the process and procedure by which the PSC issued its Compliance Tariff

Order. MECG argues the PSC erred in issuing its Compliance Tariff Order because: (1) the PSC unlawfully expedited the 30-day notice period in section 393.140(11) to an unreasonable fifteen hours (Point One); (2) there was not good cause to expedite the notice period (Point Two); (3) section 393.140(11) does not authorize the PSC to expedite the thirty-day statutory publication period (Point Three); (4) there were not adequate findings of fact to support the PSC's Compliance Tariff Order (Point Four); (5) the PSC's Compliance Tariff Order was not supported by substantial and competent evidence (Point Five); (6) the PSC denied MECG the opportunity to cross-examine the PSC's staff witnesses regarding the contents of their affidavits in support of the Compliance Tariff Order (Point Six); and (7) the PSC denied MECG the opportunity to present evidence to show that KCPL's compliance tariffs did not comply with the September 2 Report and Order (Point Seven).

**Analysis**

Before we can address the merits of MECG's appeal, we must first consider the PSC's argument that MECG's appeal is moot. "A threshold question in any appellate review of a controversy is the mootness of the controversy." *Kansas City Power & Light Co. v. Midwest Energy Consumers Grp.*, 425 S.W.3d 142, 144 (Mo. App. W.D. 2014). "A moot issue is one upon which, if we resolved it in the appellant's favor, our holding would have no practical effect." *Id.* (quoting *T.C.T. v. Shafinia*, 351 S.W.3d 34, 36 (Mo. App. W.D. 2011)). "When an event occurs that makes a decision on appeal unnecessary or makes it impossible for the appellate court to grant effectual relief, the appeal is moot

36

and generally should be dismissed." *Id.* (quoting *State ex rel. Chastain v. City of Kansas City*, 968 S.W.2d 232, 237 (Mo. App. W.D. 1998)).

MECG appeals from the PSC's Compliance Tariff Order, which approved the Final Compliance Tariffs filed by KCPL on September 15, 2015. Should this Court vacate the Compliance Tariff Order, it would be as if that order had never been made. *See State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 266 S.W.3d 842, 843 (Mo. banc 2008) ("The general rule is that when an order or judgment is vacated, the previously existing status is restored and the situation is the same as though the order or judgment had never been made.") In such a scenario, by operation of section 393.140(11), the Final Compliance Tariffs filed by KCPL on September 15, 2015 would have gone into effect by the non-action of the PSC. *See* Section 393.140(11*); see also State ex rel. Laclede Gas Co. v. Pub. Serv. Comm'n*, 535 S.W.2d 561, 566 (Mo. App. 1976)[6]. Further, section 393.140(11) provides that after the tariffs are filed and take effect, no corporation is able to "demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges applicable" at that time. This is called the "filed rate doctrine" and constitutes a general rule against "retroactive ratemaking." *See e.g., State ex rel. AG Processing v. Pub. Serv. Comm'n*, 340 S.W.3d 146, 150 (Mo. App. W.D. 2011). Therefore, even if this Court were to find some error by the PSC regarding the Compliance Tariff Order, by virtue of

---

[6] "The 'file and suspend' provisions of the statutory sections quoted above lead inexorably to the conclusion that the Commission does have discretionary power to allow new rates to go into effect immediately or on a date sooner than that required for a full hearing as to what will constitute a fair and reasonable permanent rate. This indeed is the intended purpose of the file and suspend procedure. Simply by non-action, the Commission can permit a requested rate to go into effect."

37

section 393.140(11), the Final Compliance Tariffs became effective and now, because of the filed rate doctrine, this Court can provide no meaningful relief to MECG.

MECG concedes in briefing before this Court that it agrees with the above analysis that prior to 2011 this case would have been moot absent an exception to the mootness doctrine. MECG argues, however, that section 386.520, enacted in 2011, makes the case no longer moot. Section 386.520.2 provides, in relevant part:

> 2. With respect to orders or decisions issued on and after July 1, 2011, that involve the establishment of new rates or charges for public utilities that are not classified as price-cap or competitive companies, there shall be no stay or suspension of the commission's order or decision, however:
>
> (1) In the event a final and unappealable judicial decision determines that a commission order or decision unlawfully or unreasonably decided an issue or issues in a manner affecting rates, then the court shall instruct the commission to provide temporary rate adjustments and, if new rates and charges have not been approved by the commission before the judicial decision becomes final and unappealable, prospective rate adjustments.

It appears that the application of this particular statute is a matter of first impression. The parties have not identified any cases actually interpreting this section or discussing how this section could impact the previously discussed general rule against retroactive ratemaking. To interpret a statute, we begin with the language chosen by the legislature. "If the intent of the legislature is clear and unambiguous, by giving the language used in the statute its plain and ordinary meaning, then we are bound by that intent and cannot resort to any statutory construction in interpreting the statute." *State ex rel. Union Elec. Co.*, 399 S.W.3d at 479-80 (quoting *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 455 (Mo. banc 2011)).

When determining the meaning of statutory language, the whole act must be taken into consideration, and the words of one section or statute must be read in the context of other statutes on the same subject as well as with cognate sections. We presume that the legislature intended that each word, clause, sentence, and provision of a statute have effect and should be given meaning.

*In re KCP&L Greater Mo. Operations Co.*, 408 S.W.3d 175, 186 (Mo. App. W.D. 2013) (internal citations and quotations omitted).

Section 386.520.2 and its subparts only apply to orders and decisions of the PSC "that involve the establishment of new rates or charges for public utilities . . . . " MECG's sole argument that its appeal is not moot relies upon the operation of section 386.520.2 in the event that this Court finds error regarding the process and procedure followed by the PSC with respect to the PSC's Compliance Tariff Order. Therefore, the first question that must be answered is whether section 386.520.2 is even applicable to the PSC's action with respect to the Compliance Tariff Order.

This Court has recently explained the process and procedures used to establish new rates for a utility as follows:

The PSC was created and established to regulate public utilities that operate in Missouri. § 386.040; *State ex rel. Office of Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 331 S.W.3d 677, 681 (Mo. App. W.D. 2011). "The PSC is authorized to approve rate schedules for electrical corporations, typically during a general rate case, as long as the rate is just and reasonable both to the utility and to its customers." *Office of Pub. Counsel*, 331 S.W.3d at 681 (citing § 393.150).

Usually, a rate case begins when a utility files a schedule with the PSC, stating a new rate. § 393.150.1. The new rate schedule becomes effective automatically unless the PSC suspends it under section 393.150.1. When a proposed rate schedule is suspended pursuant to section 393.150.1, the PSC must provide notice to the affected parties, hold a full hearing, and consider

39

all relevant factors before approving any new rate. *Office of Pub. Counsel*, 331 S.W.3d at 681.

After a new rate is approved, the utility publishes a proposed tariff sheet. *See State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 276 S.W.3d 303, 305 (Mo. App. W.D. 2008). "'A tariff is a document which lists a public utility['s] services and the rates for those services.'" *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n*, 210 S.W.3d 330, 337 (Mo. App. W.D. 2006) (quoting *Bauer v. Sw. Bell Tele. Co.*, 958 S.W.2d 568, 570 (Mo. App. E.D. 1997)). The PSC reviews the proposed tariff sheets to determine whether the proposed tariffs comply with the order approving the new rate. *See Mo. Gas Energy*, 210 S.W.3d at 337. Only after the PSC's review and approval do the proposed tariffs take effect. *See* 4 CSR 240–3.010(28).

"In the context of cases before the [PSC], the terms 'tariff' and 'rate schedule' are synonymous." *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 311 S.W.3d 361, 364 n.3 (Mo. App. W.D. 2010). In practice, it is common in a rate case for the PSC to approve a new rate in an initial report and order with findings of fact and conclusions of law, and then to issue one or more subsequent orders approving the proposed tariff sheets that implement the previously approved rate change. *See, e.g., State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 236 S.W.3d 632, 634–35 (Mo. banc 2007); *AG Processing, Inc.*, 276 S.W.3d at 305.

*In re KCP & L Greater Mo. Operations Co.*, 408 S.W.3d at 178.

When are the new rates and charges "established"? We think it is clear that "new rates and charges" are established for a public utility in the contested case, after a formal hearing, and set by the PSC's Report and Order. The PSC is charged with adopting rules to govern its own hearing procedures. Section 386.410. The record in a formal hearing stands as submitted for consideration by the PSC after the recording of all the evidence or, if applicable, the filing of briefs and oral argument. *See* 4 CSR 240.2.150(1). The Report and Order is the culmination of the PSC's formal hearing wherein interested parties are provided the opportunity to conduct discovery, submit and question evidence, and present their case before the PSC. The Report and Order then establishes the new

rates and charges that the utility then implements by filing new tariffs. Subsequent orders from the PSC, such as the Compliance Tariff Order, merely assure that the subsequent tariffs submitted by a utility comply with the substantive findings in the PSC's Report and Order. *See e.g., State ex rel. Aquila, Inc. v. Pub. Serv. Comm'n*, 326 S.W.3d 20, 25 (Mo. App. W.D. 2010) (orders issued subsequent to the Report and Order merely determined whether the utility complied with the mandates and substantive standards adopted by the PSC in its Report and Order).

After the PSC issues its Report and Order, there is no longer a contested case. Chapter 386 governs the procedures before the PSC. The Missouri Administrative Practices Act ("MAPA"), Chapter 536, applies to proceedings before the PSC where there is a procedural gap in Chapter 386. *See State ex rel. Noranda Aluminum, Inc.*, 24 S.W.3d at 244-45; *State ex rel. Coffman v. Pub. Serv. Comm'n*, 121 S.W.3d 534, 539 (Mo. App. W.D. 2003) (*overruled on other grounds*)[7]. Chapter 386 does not discuss the distinction between a contested and noncontested case, so instead we turn to MAPA. *State ex rel. Coffman*, 121 S.W.3d at 539. "Normally, determining whether a case is contested or noncontested is of crucial importance because it determines not only the procedural requirements that the administrative proceeding must satisfy but also the type and extent of review which the circuit and appellate courts may employ." *Id.*

The answer to whether a matter before the PSC is contested or noncontested depends on the answer to a single question: Is the PSC required by law to hold a hearing?

---

[7] *State ex rel. Coffman* repeatedly refers to Chapter 368, which is a chapter pertaining to loan and investment companies. However, *Coffman* repeatedly refers to *Noranda*, which in fact discusses the application of MAPA to the PSC and Chapter 386. It appears that the references to Chapter 368 in *Coffman* are a mistake and were intended to refer to Chapter 386.

41

If the answer is yes, then the matter is a contested case. *Id.; see also* Section 536.010(4). The requirement to hold a hearing can be imposed expressly by statute or ordinance. *State ex rel. Coffman*, 121 S.W.3d at 539. The requirement to hold a hearing may also be imposed by due process principles where, for example, the agency decision "concerns a protected property interest." *Id.; see also State ex rel. Yarber v. McHenry*, 915 S.W.2d 325, 328 (Mo. banc 1995). A "hearing" under MAPA has been interpreted to mean a proceeding in which "a measure of procedural formality is followed." *City of Valley Park v. Armstrong*, 273 S.W.3d 504, 507 (Mo. banc 2009). Such formalities in a contested case generally include notice of the issues, oral evidence taken upon oath or affirmation and cross-examination of witnesses, the making of a record, adherence to evidentiary rules, and written decisions including findings of fact and conclusions of law. *Id.* (citing *Hagely v. Bd. of Educ. of Webster Groves Sch. Dist.*, 841 S.W.2d 663, 668 (Mo. banc 1992)).

Pursuant to statute and the PSC's adopted rules, the PSC may suspend filed tariffs to conduct full rate case proceedings. *See* Section 393.150.1. The rules of procedure for those hearings are set forth in Chapter 386 and also in rules adopted by the PSC pursuant to section 386.410. Those rules include provisions regarding service upon parties, 4 CSR 240-2.080, rules regarding discovery, 4 CSR 240-2.090, and rules regarding the presentation of evidence, 4 CSR 240-2.130. Pursuant to 4 CSR 240-2.150(1), "[t]he record of a case shall stand submitted for consideration by the commission after the recording of all evidence or, if applicable, after the filing of briefs or the presentation of oral argument." Thereafter, the PSC's order must be in writing and issued as soon as

42

practicable after the record has been submitted, stating its conclusions. 4 CSR 240-2.150.2. Since the case at this point is a contested case and Chapter 386 does not specify what would constitute adequate findings of fact, Missouri courts have applied MAPA, which requires that

> [e]very decision and order in a contested case shall be in writing, and except in default cases or cases disposed of by stipulation, consent order or agreed settlement, the decision, including orders refusing licenses, shall include or be accompanied by findings of fact and conclusions of law. The findings of fact shall be stated separately from the conclusions of law and shall include a concise statement of the findings on which the agency bases its order.

*State ex rel. Pub. Counsel*, 274 S.W.3d at 576 (quoting Section 536.090).

After the record of the case is submitted and the PSC issues its final report and order, the procedural protections afforded rate case proceedings expire. After the PSC issues its final report and order, the only right afforded the parties is the right to seek rehearing. *See* Section 386.500; 4 CSR 240-2.160. The PSC need only grant a rehearing "if in its judgment" there is a "sufficient reason therefor [ . . . .]" Section 386.500. MECG has identified no requirement by statute or rule that after the close of evidence and after the PSC issues its final Report and Order, that each subsequent order issued by the PSC to ensure compliance with its substantive findings in the Report and Order must be preceded by a hearing. The contested case at that point is closed. In this case, MECG requested a hearing when it filed its objections to the proposed compliance tariffs and affidavits in support thereof, which was denied by the PSC. We see no statute or rule that would require new contested proceedings to consider a challenge to new tariffs filed pursuant to the PSC's Report and Order.

43

This result aligns with the "file and suspend" procedure adopted by the PSC and utilized in this case. in which the PSC is granted the discretion, in the first instance, to decide whether to approve a filed tariff without a formal hearing. *See* Sections 393.150.1 and 393.140(11); *State ex rel. Coffman*, 121 S.W.3d at 541 (review of PSC's decision to approve a tariff under a file and suspend case is for abuse of discretion). Here, the initial tariffs filed by KCPL were suspended so that a formal hearing on the issues could be conducted. The hearing was conducted, which resulted in the final Report and Order, at which point the contested case closed. The PSC in its Report and Order rejected KCPL's tariffs and ordered KCPL to file new tariffs complying with the Report and Order. The Report and Order provided the other parties an opportunity to comment upon the compliance tariff sheets for the benefit of the PSC's deliberations, but, at that point, no party had a *right* to a hearing before the PSC decided whether the compliance tariffs actually complied with the Report and Order.

Having established that no rule or statute required a hearing prior to the Compliance Tariff Order, the next issue is whether due process requires a hearing. *State ex rel. Coffman*, 121 S.W.3d at 539. This issue has been settled that "there is no protected property interest in a particular utility rate." *Id.; State ex rel. Jackson Cty. v. Pub. Serv. Comm'n* 532 S.W.2d 20, 31 (Mo. banc 1975). As there is no protected property interest in utility rate, due process does not require a hearing. *State ex rel. Coffman*, 121 S.W.3d at 539. Therefore, we find that the PSC is not required to hold a

hearing prior to issuing subsequent orders implementing compliance tariffs to ensure they conform to the substantive findings and conclusions reached in the Report and Order.[8]

Accordingly, pursuant to MAPA, subsequent orders issued by the PSC to ensure compliance with its Report and Order are orders issued in a noncontested case. Orders in a noncontested case are not subject to reasonableness review as the PSC is not required to issue findings of fact. *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 210 S.W.3d 344, 354-55 (Mo. App. W.D. 2006); *see also In re KCP & L Greater Mo. Operations Co.*, 408 S.W.3d at 190 n.19 ("an order approving tariffs is not the type of PSC order that contains findings of fact, an element essential to a review of reasonableness; therefore, generally, reasonableness is not a proper basis to challenge an order approving tariffs.") As there are extensive procedural protections in place in Chapter 386 to govern the establishment of rates, we think it is reasonable to conclude that subsequent orders issued in an uncontested case to implement the findings of the contested case cannot be said to "establish" rates.

Further, by its very terms, section 386.520.2 only applies in instances where there is an unappealable judicial decision that has determined that the PSC's order "unlawfully or unreasonably decided an issue or issues *in a manner affecting rates*" (emphasis added). As explained above, MECG did not challenge the September 2 Report and Order

---

[8] The parties have not identified any cases directly addressing the specific issue of whether orders issued to implement the findings of the Report and Order are orders in a contested case or a noncontested case. This Court in the past has treated such orders as noncontested. In *State Public Service Commission v. Missouri Gas Energy*, this Court treated such an order as being entered in a noncontested case, as that was the PSC's finding and that finding was not challenged on appeal. 395 S.W.3d 540, 544 (Mo. App. W.D. 2013). Other cases have also suggested, although not directly addressed, that these orders arise out of a noncontested case. *See In re KCP&L Greater Mo. Operations Co.*, 408 S.W.3d at 190 n.19 (compliance tariff orders are generally not orders that require findings of fact and not subject to reasonableness review).

establishing KCPL's rates. MECG only argues on appeal that the PSC erred in the process and procedure afforded to MECG to review and challenge the compliance tariff orders. MECG has not even challenged on appeal the substantive finding by the PSC that the Compliance Tariff Order does comply with the Report and Order. Even if we were to find that the process and procedure followed by the PSC was deficient, there would not be a finding by this Court that the PSC had decided an issue unlawfully or unreasonably in a manner affecting rates.

The Report and Order of the PSC is the culmination of the hearing required by law and is the order of the PSC establishing new rates or charges for public utilities. Subsequent orders by the PSC ensuring compliance with the Report and Order are orders issued in a non-contested case merely implementing the previous decision of the PSC. As such, we find that Section 386.520.2 is inapplicable to MECG's challenge to the Compliance Tariff Order. Pursuant to the filed rate doctrine, this Court cannot provide any meaningful relief even if MECG's appeal were meritorious.

Even if an appeal is moot, we may exercise our discretion to consider an appeal if one of two narrow exceptions are met. *State ex rel. Mo. Energy Dev. Ass'n v. Pub. Serv. Comm'n*, 386 S.W.3d 165, 176 (Mo. App. W.D. 2012).

> First, the issue may be considered if the case becomes moot after it has been argued and submitted. Additionally, the issue may be considered if it is one of general public interest and importance, recurring in nature and will otherwise evade appellate review unless the court exercises its discretionary jurisdiction.

*Id.* (internal citations omitted). The first exception is not applicable here as the case became moot prior to argument and submission.

46

The question, therefore, is whether the issues presented by MECG are ones of general public interest and importance, recurring in nature and would otherwise evade appellate review. We find that that MECG's appeal and the issues presented therein are not the type that are likely to evade appellate review. This Court has in fact considered other cases in which parties have challenged the process and procedure used by the PSC to approve compliance tariffs. *See e.g., State ex rel. Office of the Pub. Counsel v. Pub. Serv. Comm'n*, 409 S.W.3d 522 (Mo. App. W.D. 2013) (granting writ of mandamus upon finding that PSC order approving compliance tariffs did not provide a reasonable time for review under Section 386.490.1). We find that the issues raised by MECG are not likely to evade appellate review and we decline to exercise our discretion to consider MECG's moot appeal.

## Conclusion

The decision of the PSC is affirmed and MECG's appeal is dismissed as moot.

Gary D. Witt, Judge

All concur