

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

OFFICE OF PUBLIC COUNSEL )
and MIDWEST ENERGY )
CONSUMERS GROUP; )
MISSOURI PUBLIC SERVICE )
COMMISSION, )
     Respondents, )
          )
v.          ) **WD83319**
          )
EVERGY MISSOURI WEST, INC. ) **FILED: July 28, 2020**
f/k/a KCP&L GREATER )
MISSOURI OPERATIONS )
COMPANY, )
      Appellant. )

**Appeal from the Public Service Commission**

**Before Division Two: Mark D. Pfeiffer, P.J., and
Alok Ahuja and Gary D. Witt, JJ.**

Evergy Missouri West, Inc. appeals from a Report and Order issued by the Public Service Commission (the "PSC" or "Commission"). The PSC's Report and Order established an accounting authority order ("AAO") to capture the cost savings Evergy experienced due to the retirement of its coal-fired electric power plant in Sibley. An AAO creates a balance-sheet account to defer extraordinary financial items for consideration in a utility's next general rate case, even though the items may occur outside the "test year" utilized in the future rate case. *State ex rel. Aquila, Inc. v. Pub. Serv. Comm'n*, 326 S.W.3d 20, 27 (Mo. App. W.D. 2010).

Evergy raises four Points on appeal. In its first and second Points, it argues that the Commission erred in ordering an AAO because Evergy's retirement of the

Sibley plant was not an "extraordinary" event under the relevant accounting standards. In its third Point, Evergy argues that imposition of an AAO constitutes an improper collateral attack on the tariffs established in Evergy's last general rate case. Finally, Evergy's fourth Point argues that the Commission acted inconsistently with the prospective focus of Missouri's ratemaking statutes, by ordering an AAO which is intended to remedy Evergy's past collection of purportedly excessive revenues.

We affirm.

### Factual Background

The Sibley generating plant, which consisted of three coal-fired units, was constructed on the Missouri River near the town of Sibley in Jackson County. The three units were constructed between 1960 and 1969, and together had a generating capacity of 463 megawatts. The Sibley facility was Evergy's largest capacity power plant.

In 1991, Evergy[1] completed a major renovation of the Sibley generating units, to extend their life and allow them to burn low-sulfur western coal. In *State ex rel. Office of the Public Counsel v. Public Service Commission*, 858 S.W.2d 806 (Mo. App. W.D. 1993), we affirmed the Commission's order granting Evergy's request to use an AAO to defer costs associated with the 1991 renovations for consideration in the company's next rate case. *Id.* at 810-12.

In 2009, Evergy put new scrubbers on Sibley Unit 3 – the largest of the three generating units at the plant – to meet environmental requirements.

---

[1] Evergy Missouri West, Inc. was formerly known as KCP&L Greater Missouri Operations Company. Because the distinction between Evergy and its corporate predecessors is not relevant to any of the issues presented in this appeal, we refer to Evergy and its predecessors generically as "Evergy" in this opinion.

On June 1, 2017, Evergy retired all of Sibley Unit 1 except the boiler. The next day, on June 2, 2017, Evergy announced that it would be retiring the entire Sibley plant by December 31, 2018.

Evergy had a general rate case pending before the Commission in 2018. In the rate case, the Commission used a historic test year with a true-up date of June 30, 2018.[2] The Sibley plant was still operating on the true-up date. In Evergy's 2018 rate case, the Office of Public Counsel ("OPC") expressed its concern that Sibley Unit 3 was being retired prematurely. OPC noted that, in 2016, Evergy attributed a useful life of 71 total years, through 2040, to Unit 3; but, "based on [Evergy]'s announced retirement date, the useful life of the unit . . . is [now] a little over six months." OPC recommended to the PSC "that all of the costs associated with the retirements of . . . [Evergy's] Sibley units 1, 2, 3 and Sibley common plant not be included in the . . . utility's cost of service used for setting rates, as each of these units will be retired by end of 2018." OPC argued:

> [Evergy] is seeking . . . as part of its case continued depreciation expense for Sibley Units 1, 2, and 3, even though it has announced plans to retire the units by the end of 2018. [Evergy] seeks to collect this depreciation expense in rates for up to four years during which the units will be retired and not used. . . . Additionally, in its rate case [Evergy] seeks to build in operating and fuel expense for the units, also to be collected over the next four years. Make no mistake, this case is about beneficial regulatory lag for [Evergy] related to building into its rates expenses for generating units that [Evergy] has announced will be retired shortly after the end of the true-up period in its case.

---

[2] "In Missouri, rates are set using a historical test year. The Commission examines the utility's revenues and expenses for that test year and uses that information to set rates to be charged in the future." *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 274 S.W.3d 569, 585-86 (Mo. App. W.D. 2009). "The PSC's use of a true-up audit and hearing is designed to balance the historical data [from the test year] with known and measurable subsequent and future changes . . . ." *In Matter of Kansas City Power & Light Co.'s Request for Auth. to Implement a Gen. Rate Increase for Elec. Serv. v. Pub. Serv. Comm'n*, 509 S.W.3d 757, 767 (Mo. App. W.D. 2016); *see also State ex rel. Praxair, Inc. v. Pub. Serv. Comm'n*, 328 S.W.3d 329, 332 n.2 (Mo. App. W.D. 2010).

OPC "recommend[ed] that the depreciation rates for Sibley Units 1, 2, 3, and Sibley common plant be set to zero percent as the units will no longer be used and useful by the time new rates from this case are effective." The Office also recommended that "no [Sibley-related] operations or maintenance expense should be included in the costs of service used for setting rates in these cases." It explained:

> Based on the applications, new rates are projected to become effective December 29, 2018. When paired with the announcement of the retirements of the Sibley units and Sibley common plant by the end of 2018, the longest the units could be operating under new rates is two days. It is very likely that by the time new rates from these cases are effective the units will have been retired. Ratepayers should not be asked to pay for operations and maintenance expense on units that are no longer used and are not providing a benefit.

Evergy opposed OPC's recommendation that all Sibley-related expenses be excluded from the calculation of new rates in the 2018 rate case, "on the basis that the retirement was not certain to occur and [that consideration of the financial consequences of any retirement] was premature."

On September 5, 2018, a forced outage occurred at Sibley Unit 3 because of a turbine vibration. The next day, Evergy sent a routine notification, not associated with the rate case, to PSC Staff regarding the outage. The Sibley plant never again produced electricity following this forced outage of Unit 3.

On October 2, 2018, the Vice President for Generation Operations of Evergy's parent company stated in an internal email that "[i]t is our intention to cease burning coal and move to decommissioning activities" at Sibley. On the same day, the Vice President sent an email to the officers of Evergy's parent company, informing them that, "[f]ollowing a comprehensive evaluation of options, we have determined the safest and most economical solution is to cease burning coal at the [Sibley] station and to move the remaining coal currently on the ground to [another Evergy power plant at] Iatan." The e-mail stated that Evergy would notify the

4

Southwest Power Pool and a representative of Local 412 of the International Brotherhood of Electrical Workers of the planned shut-down.

The parties entered into a series of stipulations to resolve Evergy's 2018 rate case. In particular, the parties entered into a Non-Unanimous Partial Stipulation and Agreement to resolve issues concerning Evergy's revenue requirements. Although the Office of Public Counsel did not join in the Stipulation and Agreement addressing revenue issues, it did not object to the stipulation, or request a hearing; the Commission accordingly treated the stipulation as unanimous.

On October 3, 2018 – the day after the internal e-mails indicating that Evergy's senior management had concluded that the Sibley plant should be immediately retired – the parties presented evidence to the Commission supporting their stipulations. As part of its presentation, Evergy moved to have its pre-filed testimony admitted in evidence. Despite the high-level internal recommendation that the Sibley plant be immediately retired, Evergy did not revise its pre-filed testimony, which characterized the Sibley plant's closure as an assumption, and uncertain. The Commission approved the parties' stipulations on October 31, 2018.

The Stipulation and Agreement resolving revenue issues specifically addressed the costs and expenses associated with the Sibley plant, and the possibility that the plant might be retired in the future. The Stipulation provided:

> [Evergy] will create a regulatory liability[3] to capture the amount of depreciation expense included in [Evergy's] revenue requirement beginning when each of the following units is retired and depreciation expense is no longer recorded on GMO's books:

---

[3] The Manager of the PSC's Auditing Department, Mark Oligschlaeger, explained that "[a] regulatory liability represents amounts that a utility would ordinarily book as an increase to earnings, but are instead preserved on the utility's balance sheet for potential return to customers in a subsequent general rate proceeding." *See also* 18 C.F.R. Part 101, Definitions ¶ 31 (Uniform System of Accounts' definition of "Regulatory Assets and Liabilities").

5

Sibley units 1, 2, and 3, including common
plant, and Lake Road unit 4/6.

The depreciation amounts will accumulate in the regulatory liability account until new customer rates are established in a subsequent rate case. At that time, the regulatory liability account will be closed into accumulated depreciation. Additionally, the closing of this regulatory liability into accumulated depreciation will be reflected in rates that are established in that rate case.

The Signatories agree that the rates established in this case include O&M [(*i.e.*, operations and maintenance expense)] associated with the Sibley units.

***This Stipulation does not preclude any Signatory from proposing an accounting authority order ("AAO"), or any other ratemaking treatment, for the recovery of any other costs associated with the . . . [Evergy] retirements listed above***. This Stipulation does not preclude any party from opposing an AAO, or any other ratemaking treatment, for the recovery of any other costs associated with the . . . [Evergy] retirements of the units listed above.

(Emphasis added.)

On November 1, 2018, the day after the Commission approved the parties' stipulations, Evergy had a meeting with PSC Staff and the Office of Public Counsel concerning the forced outage at Sibley Unit 3. On November 13, 2018, Evergy officially decided to retire all of the Sibley generating units. On November 20, 2018, Evergy informed the Office of Public Counsel and the Commission Staff of this decision.

In Evergy's general rate case, the Commission approved Evergy's new tariffs on November 26, 2018. The new rates became effective on December 6, 2018. Pursuant to § 393.1655.2, RSMo, the rates approved by the Commission "shall be held constant" for three years, and therefore new rates cannot become effective until December 6, 2021. As contemplated by the parties' Stipulation and Agreement, the cost of operating the Sibley plant was incorporated into Evergy's new rates.

On December 28, 2018, the Office of Public Counsel and the Midwest Energy Consumers Group filed a Petition for an Accounting Order.[4] Because Evergy's rates included the costs associated with operating the retired Sibley plant, the petition requested that "the Commission order [Evergy] to record as a regulatory liability in Account 254 the revenue and the return on the Sibley unit investments collected in rates for non-fuel operation and maintenance costs, taxes including accumulated deferred income taxes, and all other costs associated with Sibley units 1, 2, 3, and common plant." In their testimony to the Commission, the petitioners suggested that the cost savings to Evergy from the Sibley plant retirement, which they sought to defer through an AAO, were between $29.7 and $39 million per year.

An evidentiary hearing was held on August 7 and 8, 2019. At the hearing, evidence was presented that Evergy's current depreciation rates for Sibley Unit 3 were based on a 2040 retirement date. The manager of the PSC's Auditing Department, Mark Oligschlaeger, testified that he was not aware of a generating plant being retired twenty years before the expiration of its useful life. Estimates of the net book value of the assets of the Sibley plant as of June 30, 2018, ranged from $145.7 million to $300 million. The chief economist for the Office of Public Counsel testified that the Sibley retirement was the only coal plant retirement in the 14-State footprint of the Southwest Power Pool that had a projected remaining operational life of more than twenty years, and more than $100 million in remaining book value. The Director of Policy for the Office of Public Counsel noted that Evergy had not retired a major generating facility in the last thirty years. Furthermore, in the last forty years, Evergy had only retired two facilities – one in 1982, and the other in 1987.

---

[4] After the petition was filed, the Commission determined that the petition was best considered using complaint-type procedures, so it closed the original file and refiled the petition as a complaint.

7

In a 2018 filing with the Securities and Exchange Commission, Evergy's parent company indicated that its "regulatory assets increased by $243.4 million primarily due to the reclassification of retired generating plant of $159.9 million related to [Evergy's] Sibley No. 3 Unit from property, plant and equipment, net to a regulatory asset upon the retirement of the unit in 2018." The Office of Public Counsel's Director of Policy testified that the recognition of this regulatory asset indicated that Evergy intends to seek recovery of these costs from ratepayers in a future rate case.

At the hearing, Evergy's witnesses testified that the retirement of coal-fired generating units is common in the electric utility industry nationwide. For example, Evergy's evidence indicated that a total of 89,731 megawatts of coal-fired generating capacity has been retired since 1969. Of that total, 76,526 megawatts, or approximately 85 percent, has been retired since 2010. Further, since 1969, "a total of 815 coal-fired units have retired, with 543 units or two-thirds of the total having retired during the last 9 years." Evergy's evidence indicated that the pace of retirement of coal-fired power plants was accelerating across the electric utility industry.

In a Report and Order issued on October 17, 2019, the Commission ordered that an AAO be established.[5] The Commission noted that "[Evergy]'s ratepayers are continuing to pay for [Evergy]'s ongoing expenses to operate the Sibley units even though they are no longer producing power." The Commission found that the aggregate financial impact of the Sibley retirement "exceeds five percent of [Evergy]'s reported net income." It also found that "[Evergy]'s position in the rate case was that while it anticipated the Sibley units would be retired by December 31, 2018, that decision had not been finally made and the retirement could be delayed

---

[5] Three commissioners concurred in the Commission's order, one commissioner concurred in a separate opinion, and one commissioner dissented.

by unforeseen circumstances such as the loss of other generating facilities." The Commission found that

> [Evergy] did not inform the signatories to the stipulation and agreement, including Public Counsel, or the Commission, except for a routine notification to Staff, that Sibley 3 had ceased operation in September until the units were formally retired in November, which was after the stipulation and agreement had been approved by the Commission on October 31, 2019.

(Footnotes omitted). The Commission found that, had the Office of Public Counsel or Midwest Energy Consumers Group "known that Sibley 3 had ceased producing power and would be retired, they could have proposed an isolated adjustment outside the test year and true-up date to remove the operating costs of the retired units from [Evergy]'s new rates."

The Commission noted that this was an unusual case because the AAO was being requested by parties representing ratepayers "to defer to a regulatory liability the savings the utility will accrue from its decision to close the" Sibley plant, rather than a utility requesting to capture unanticipated *expenses* in a regulatory asset for consideration in a future rate case. Despite the unusual nature of the request, the Commission determined that the AAO request was governed by the same standards applied in past cases.

The Commission concluded that the retirement of the Sibley plant was an extraordinary event which justified the creation of an AAO to capture Evergy's cost savings for consideration in a future rate case:

> Clearly, it is unusual for [Evergy] to retire a generating unit as it has not done so in the past thirty years. More importantly, it is unusual and unique for a utility to retire a generating unit with twenty years of remaining anticipated service life, and twenty years of unrecovered depreciation expense. It is also significant that the Sibley plant was retired just after [Evergy]'s last rate case was resolved and in fact before those new rates went into effect. Because of the . . . rate freeze [mandated by § 393.1655.2, RSMo], those rates, through which [Evergy]'s ratepayers will continue to pay [Evergy]'s cost of operating a

power plant that no longer produces power, will remain in effect for at least three years.

Most importantly, if [Evergy] requests accelerated recovery of net plant depreciation costs in its next rate case, the Commission should preserve the option of the future Commission to consider the offset of those costs by consideration of the past savings amounts that would be deferred under the AAO. If this AAO is not granted, such an offset could be challenged as retroactive ratemaking.

[Evergy] chose to close the Sibley Units, and the prudence of that decision is not at issue in this case. The question of prudence will be addressed in a future general rate case. . . .

. . . [Evergy's] current rates were set in [its] last rate case using an assumption that the Sibley units were in operation and that the costs of operating those units would be recovered from ratepayers through those rates. [Evergy's] net income was thus enhanced when the costs of operating the Sibley units went away with the closing of the plant, while rates including those costs remain in effect. This order requires [Evergy] to defer that enhancement to its earnings, but it does not impair the company's opportunity to earn the rate of return established in its last rate case.

After its application for rehearing was denied by the Commission, Evergy filed this appeal.

**Standard of Review**

Our review of the PSC's Report and Order is two-fold. *In Matter of Kansas City Power & Light Co.'s Request for Auth. to Implement a Gen. Rate Increase for Elec. Serv. v. Pub. Serv. Comm'n*, 509 S.W.3d 757, 763 (Mo. App. W.D. 2016) (citation omitted) ("*KCP&L*").

First, we must determine whether the PSC's order was lawful. An order's lawfulness depends on whether the PSC's order and decision was statutorily authorized. When determining whether the order is lawful, we exercise independent judgment and must correct erroneous interpretations of the law. Because the PSC is purely a creature of statute, its powers are limited to those conferred by statute either expressly, or by clear implication as necessary to carry out the powers specifically granted.

Second, we must determine whether the PSC's order was reasonable. In determining whether the Commission's order is reasonable, we consider (1) whether it was supported by substantial

10

and competent evidence on the whole record, (2) whether the decision was arbitrary, capricious, or unreasonable, and (3) whether the PSC abused its discretion.

*Union Elec. Co. v. Pub. Serv. Comm'n*, 591 S.W.3d 478, 484–85 (Mo. App. W.D. 2019) (citation and internal quotation marks omitted).

If substantial evidence supports either of two conflicting factual conclusions, we are bound by the findings of the administrative tribunal. The determination of witness credibility is left to the Commission, which is free to believe none, part, or all of the testimony. It is only where a Commission order is clearly contrary to the overwhelming weight of the evidence that we may set it aside. Additionally, with regard to issues within the Commission's expertise, we will not substitute our judgment for that of the Commission.

*KCP&L*, 509 S.W.3d at 764 (citation and internal quotation marks omitted).

## Analysis

### I.

In its first and second Points, Evergy argues that the Commission erred in ordering an AAO to capture the cost savings associated with the retirement of the Sibley plant, because the plant's retirement was not an "extraordinary" event.

The general powers of the Commission are set forth in § 393.140, RSMo. *State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 858 S.W.2d 806, 808 (Mo. App. W.D. 1993). Pursuant to § 393.140(4), the Commission has the power "to prescribe uniform methods of keeping accounts." *KCP&L*, 509 S.W.3d at 769. Under this authority, "[t]he PSC has adopted a rule that requires utilities to use the [Uniform System of Accounts ('USOA') prescribed by the Federal Energy Regulatory Commission] to maintain their books and records." *Id.* (citing 4 CSR 240-20.030, which has been transferred to 20 CSR 4240-20.030); *see also Office of Pub. Counsel*, 858 S.W.2d at 808.

The Uniform System of Accounts provides, with few exceptions, that "net income shall reflect all items of profit and loss during the period." 18 C.F.R. Part 101, General Instruction 7. "An exception to this general rule is for 'extraordinary

11

items' as defined by the USOA." *KCP&L*, 509 S.W.3d at 769–70. General Instruction 7 to the Uniform System of Accounts provides:

> Those items related to the effects of events and transactions which have occurred during the current period and which are of unusual nature and infrequent occurrence shall be considered extraordinary items. Accordingly, they will be events and transactions of significant effect which are abnormal and significantly different from the ordinary and typical activities of the company, and which would not reasonably be expected to recur in the foreseeable future. (In determining significance, items should be considered individually and not in the aggregate. However, the effects of a series of related transactions arising from a single specific and identifiable event or plan of action should be considered in the aggregate.[)] To be considered as extraordinary under the above guidelines, an item should be more than approximately 5 percent of income, computed before extraordinary items.

18 C.F.R. Part 101, General Instruction 7.

An AAO permits "extraordinary items" to be deferred and accounted for in a future accounting period. *See State ex rel. Aquila, Inc. v. Pub. Serv. Comm'n*, 326 S.W.3d 20, 27 (Mo. App. W.D. 2010). "The PSC has followed the guidance in 18 C.F.R. Part 101, General Instruction 7, that costs should not be deferred to another accounting period except for 'extraordinary items.'" *KCP&L*, 509 S.W.3d at 770. In following General Instruction 7, the Commission has decided that the use of AAOs "should be limited because they violate the matching principle, tend to unreasonably skew ratemaking results, and dull the incentives a utility has to operate efficiently and productively under the rate regulation approach employed in Missouri." *Id.* at 769.

We have emphasized that, because establishment of an AAO deviates from the Commission's general ratemaking methodology, the Commission has substantial discretion in determining whether an AAO is appropriate in a particular case.

> The PSC is granted wide discretion in determining the methodology it chooses to determine [a utility's return on equity]. The

12

> PSC has historically utilized the test year and true-up procedure to determine appropriate future rates because the historical test year's expenses can be used to determine reasonable future rates. . . . Whether a cost should be afforded different treatment and merits a deferral directly impacts the PSC's chosen methodology for setting rates and is necessarily a discretionary judgment that is within the expertise of the PSC and not this Court. Which costs a utility is able to defer would impact the PSC's chosen method to determine rates and is a matter properly confined to the PSC's expertise. As such, we will not second-guess the PSC's reasoned decision that only extraordinary items may qualify for deferral treatment.

*Id.* at 770 (citations and footnote omitted).

In this case, the Commission lawfully and reasonably applied the standards found in General Instruction 7 of the Uniform System of Accounts. Evergy does not dispute that the aggregate financial impact of the retirement of the Sibley plant exceeds five percent of its reported net income. The Commission's conclusion that the retirement of the Sibley plant was extraordinary due to its unusual nature and infrequent occurrence is amply supported by the record. In the past thirty years, Evergy has not retired *any* major generating facilities. Moreover, the Commission could justifiably find that it is highly unusual to retire a generating plant with twenty years of remaining anticipated service life and twenty years of unrecovered depreciation expense totaling hundreds of millions of dollars, since the evidence before it indicated that *no* similar plant retirement had occurred in the 14-State area comprehended by the Southwest Power Pool. The Commission also found that it was abnormal to retire a generating plant just after a rate case was resolved but before the new rates – which reflected the costs of operating the retired plant – became effective. And of course, a plant's retirement is a unique event which will not recur in the future.

We also note that Evergy successfully opposed the efforts of the Office of Public Counsel to have Sibley-related costs excluded from consideration in Evergy's 2018 rate case; Evergy argued in the rate case that the "decision [to retire the plant]

had not been finally made and the retirement could be delayed by unforeseen circumstances such as the loss of other generating facilities." Having successfully argued that the retirement of the Sibley plant was not sufficiently foreseeable to be considered in the 2018 rate case, Evergy can hardly complain when the Commission later determined that the cost savings associated with that retirement were "extraordinary."

We will not second guess the Commission's reasoned decision that the retirement of the Sibley plant was an extraordinary event justifying the use of an AAO to capture its financial consequences for consideration in a future rate case.

Evergy argues that the AAO was unlawful because the Commission purportedly held that foreseeable and anticipated events are not "extraordinary" items in *In the Matter of the Application of Kansas City Power & Light Co. & KCP&L Greater Missouri Operations Co. for the Issuance of an Accounting Authority Order*, EU-2014-0077, 2014 WL 3889960 (Mo. P.S.C. July 30, 2014) ("*KCP&L AAO Order*"). Evergy contends that, under this principle, no AAO should have been ordered in this case, because the retirement of the Sibley plant was foreseeable and anticipated.

At the outset, we note that "[t]he PSC is not bound by its previous decisions, so long as its current decision is not otherwise unreasonable or unlawful." *Laclede Gas Co.'s Verified Application to Re-Establish & Extend the Fin. Auth. Previously Approved by the Comm'n v. Pub. Serv. Comm'n*, 526 S.W.3d 245, 252 (Mo. App. W.D. 2017) (citations omitted); *see also, e.g., State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 120 S.W.3d 732, 736 (Mo. 2003) ("an administrative agency is not bound by *stare decisis*"). Further, we see no inconsistency between the Commission's decision in this case and the *KCP&L AAO Order*. In the earlier proceeding the utility filed an application for an AAO "to track transmissions costs associated with membership in the Southwest Power Pool and other transmission providers."

14

*KCP&L AAO Order*, 2014 WL 3889960, at *1. The Commission rejected the utility's request, but not because transmission costs were foreseeable or anticipated. Instead, the Commission denied the application because "[t]ransmission costs are part of the ordinary and normal costs of providing electric service and are expected to continue in the foreseeable future," were *not* "an unusual and infrequent occurrence," and therefore did not qualify as "extraordinary." *Id.* at *5. Nothing in the *KCP&L AAO Order* is inconsistent with the result the Commission reached in this case.

More generally, Evergy argues that its retirement of the Sibley plant cannot be "extraordinary" because it was planned and anticipated. But AAOs are not limited to unexpected Acts of God or *force majeure* events. To the contrary, the testimony before the Commission explained that the PSC had previously issued AAOs – at the request of *regulated utilities* – for the costs of planned activities such as major construction projects, gas pipeline replacement projects, and actions taken to comply with renewable energy standards or to address Year 2000/"Y2K" computer problems. Indeed, the test the Commission applies in determining whether an AAO is appropriate – the so-called "Sibley standard" – was developed in a case in which the Commission approved an AAO to capture the costs incurred by Evergy's predecessor to rebuild Sibley Units 1 and 2 "to extend the life of both units," and the costs of "converting the plant to burn low-sulfur western coal" so that it could achieve federal Clean Air Act emission standards. *Office of Pub. Counsel*, 858 S.W.2d at 808. It has never been the law that AAOs are reserved for unplanned, un-anticipatable events.

In its briefing, Evergy emphasizes that, in past cases, AAOs have been employed to protect *utilities* from the effects of extraordinary expenses or revenue shortfalls. It seemingly argues that AAOs are a "one-way street" which can only be employed to protect a utility's financial interests, not to protect *ratepayers* from the

15

financial windfall a utility may receive when it experiences extraordinary *savings* or revenue *increases*. We see nothing in General Instruction 7 which limits the use of deferral accounting to address only extraordinary costs, but not extraordinary cost savings or revenues. Rather, General Instruction 7 refers generically to extraordinary financial "items" caused by "events and transactions" which are of an "unusual nature and infrequent occurrence." General Instruction 7 does not distinguish between extraordinary "items" which decrease revenue *versus* those which increase it.

Evergy further argues that the retirement of the Sibley plant was not unusual because of the increasing frequency of coal plant retirements within the electric-utility industry as a whole. General Instruction 7 specifies, however, that whether an item is "extraordinary" is evaluated by looking at the event in relation to "the ordinary and typical activities *of the company*," not in comparison to the activities of the industry as a whole. 18 C.F.R. Part 101, General Instruction 7 (emphasis added). Further, Evergy's claim that Sibley's retirement simply reflects an industry-wide trend is inconsistent with the Commission's finding that no other plant in the 14-State Southwest Power Pool service territory had been retired with a similar remaining estimated useful life and similar net book value. In any event, many AAOs approved in the past involved the costs of addressing issues facing the entire industry, not simply an individual utility (such as the costs of complying with environmental standards or renewable energy mandates, or the costs to address "Y2K" computer problems). It has never been suggested that an AAO was inappropriate because particular costs were associated with a matter of industry-wide concern. The Commission's Report and Order properly focused on the rarity of plant retirements *by Evergy*.

Evergy emphasizes that no other state or federal regulatory commission has found that a plant retirement is an extraordinary event under General Instruction

16

7, and that the Wisconsin Public Service Commission, applying that state's regulatory scheme, has specifically rejected an AAO request like the one made here. The Wisconsin decision, *In re Wisconsin Electric Power Co.*, Order No. 6630-AF-100, 2018 WL 2938141 (Wis. P.S.C. June 6, 2018), applied a different legal standard, however. In determining whether deferral accounting was appropriate for the cost savings associated with a plant retirement, the Wisconsin commission considered, among other factors, "whether the cost is outside of the utility's control," and whether recognizing the amount in the year in which it was incurred "would cause the utility serious financial harm[,] . . . significantly distort the current year's income," or "would have a significant impact on ratepayers." *Id.* at *2. The Wisconsin standards for deferral accounting go beyond the requirements of General Instruction 7. In any event, our Public Service Commission is not bound by the holdings of courts or agencies in other jurisdictions. *State ex rel. Union Elec. Co. v. Pub. Serv. Comm'n*, 765 S.W.2d 618, 623 (Mo. App. W.D. 1988).

Next, Evergy argues the Commission's AAO order was unreasonable and arbitrary because it contradicts the order from the utility's 2018 rate case. Evergy contends that the Stipulation and Agreement that underlay the Commission's decision in the 2018 rate case "explicitly recognized [Evergy's] plans" to retire the Sibley plant "in the six months following the true-up period that ended June 20, 2018." Evergy's characterization of the proceedings in its 2018 rate case is inaccurate. As the Commission found, during its rate case Evergy opposed the Office of Public Counsel's request that the Commission take account of the upcoming retirement of the Sibley plant, by excluding Sibley-related costs from consideration in rate-setting. On the contrary, Evergy argued – successfully – that the planned retirement of the Sibley plant should <u>not</u> be considered in the rate case, because "the retirement could be delayed by unforeseen circumstances such as the loss of other generating facilities." Far from "explicitly recogniz[ing]" the Sibley

17

plant's retirement, the revenue-related Stipulation and Agreement specifically provided that, *if that retirement in fact occurred*, "[t]his Stipulation does not preclude any Signatory from proposing an accounting authority order ("AAO") . . . for the recovery of any . . . costs associated with the . . . retirement[ ]."  The petition filed by the Office of Public Counsel and the Midwest Energy Consumers Group, seeking imposition of an AAO for Sibley-related costs, is fully consistent with, and was indeed *contemplated by*, the Stipulation and Agreement which resolved revenue-related issues in Evergy's 2018 rate case.

Evergy argues that its retirement of the Sibley plant was not extraordinary because a 2018 filing by Evergy with the Federal Energy Regulatory Commission, which was audited by an independent accounting firm, does not characterize the event as extraordinary.  Evergy cites no authority for the proposition that the PSC was bound by the characterization of the transaction by Evergy or its auditor.  On the contrary, § 393.140(8), RSMo expressly gives the Commission the power "to examine the accounts" of any regulated utility, and "after hearing, to prescribe by order the accounts in which particular outlays and receipts shall be entered, charged or credited."  Our caselaw holds that the determination of whether an AAO is appropriate is for *the Commission* to make, in <u>its</u> expert discretion.  *KCP&L*, 509 S.W.3d at 770 ("The PSC . . . remains the authority that determines when an item may be included in a different accounting period for the purpose of developing authorized rates.").

Points I and II are denied.

## II.

In its third Point, Evergy argues that the Commission's order granting the AAO was an improper collateral attack on its prior order in Evergy's 2018 rate case.

Section 386.550 provides: "In all collateral actions or proceedings the orders and decisions of the commission which have become final shall be conclusive."  "This

18

statute is indicative of the law's desire that judgments be final." *State ex rel. Ozark Border Elec. Coop. v. Pub. Serv. Comm'n*, 924 S.W.2d 597, 601 (Mo. App. W.D. 1996) (citation omitted); *see also*, *e.g.*, *State ex rel. MoGas Pipeline LLC v. Pub. Serv. Comm'n*, 395 S.W.3d 562, 566 (Mo. App. W.D. 2013).

Evergy argues that its 2018 rate case "directly addressed" the issues arising out of the retirement of the Sibley plant. It contends that, because the AAO directs that costs associated with the Sibley plant's retirement be accounted for as a regulatory liability, even though the potential plant retirement was considered in setting Evergy's 2018 rates, the AAO is a collateral attack on the 2018 rate case.

As an initial matter, we note that multiple prior decisions of this Court have upheld Commission decisions authorizing Accounting Authority Orders which captured extraordinary costs incurred by a regulated utility for consideration in a future rate case. *See*, *e.g.*, *In Matter of Application of Union Elec. Co.*, 458 S.W.3d 430 (Mo. App. W.D. 2015) (*mem.*); *State ex rel. Office of Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 301 S.W.3d 556, 569-70 (Mo. App. W.D. 2009); *State ex rel. Mo. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 293 S.W.3d 63, 77-78 (Mo. App. S.D. 2009); *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n*, 210 S.W.3d 330, 335-36 (Mo. App. W.D. 2006); *State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 858 S.W.2d 806, 810-12 (Mo. App. W.D. 1993). In each of those cases, the "extraordinary" costs were incurred at a time when the utility was charging rates approved in an earlier rate case. In each of our prior cases, it could have been argued that the rates established in the earlier rate case were intended to fully compensate the utility for the costs of its operations while the rates were in effect, and that use of an AAO to defer certain costs for later consideration had the effect of altering the rate structure approved in the earlier rate case. Yet, to our knowledge, <u>no</u> prior decision has suggested that an AAO constitutes an improper collateral

19

attack on the results of an earlier rate case.  The silence of our earlier decisions on this point is deafening.

To the contrary, this Court has recognized that AAOs do _not_ alter existing rates, or constitute impermissible retroactive ratemaking.  In *State ex rel. Missouri Gas Energy v. Public Service Commission*, 210 S.W.3d 330 (Mo. App. W.D. 2006), we rejected the argument that provisions of the Commission's Emergency Cold Weather Rule ("ECWR"), which authorized utilities to use an AAO to defer certain costs to a later rate case, had the effect of modifying the utilities' current approved rates.  We explained:

> Although recovery under the AAO is conditioned on filing a subsequent rate case, this is not a case of retroactive ratemaking.  This court has held that it is permissible "to defer the final decision on current extraordinary costs until a rate case is in order."  The costs of the ECWR are merely a deferment of extraordinary costs.  This procedure does not include nor need it include any determination of the reasonableness of the current rates.  The Utilities are still charging the current tariffed rates, but under the ECWR are required to defer collection of part of the amount owed until a later time.  The ECWR allows placement of any costs of compliance with the ECWR in an AAO.  . . .  The AAO allows current losses due to the rule to be separately accounted, thus preserving the uncollected, deferred fees until the next rate case.  At that time the losses in combination with any other factors may be considered in determining a new rate.  This is not retroactive ratemaking, because the past rates are not being changed so that more money can be collected from services that have already been provided; instead, the past costs are being considered to set rates to be charged in the future.

*Id.* at 335-36 (citations omitted); *see also Mo. Gas Energy v. Pub. Serv. Comm'n*, 978 S.W.2d 434, 438 (Mo. App. W.D. 1998) (emphasizing that "AAOs are not the same as ratemaking decisions, and that AAOs create no expectation that deferral terms within them will be incorporated or followed in rate application proceedings.  The whole idea of AAOs is to defer a final decision on current extraordinary costs until a rate case is in order"; citation omitted).

20

More generally, the Missouri Supreme Court has expressly held that "limit[ing] the authority granted [to a utility] by [an earlier Commission order] does not . . . constitute a collateral attack, in violation of Section 386.550, RSMo . . ., on such order." *State ex rel. Pub. Water Supply Dist. No. 2 v. Burton*, 379 S.W.2d 593, 600 (Mo. 1964). In *Burton*, the Supreme Court held that the PSC's grant of a certificate of convenience and necessity to a utility, to operate a water distribution system in a particular location, did not prevent a local county from further limiting the geographic area within which the utility could operate. The Court explained that "[s]uch limitation in no way questions the validity of the original order. Interpretation of an order necessarily acknowledges its validity and does not constitute a collateral attack." *Id.* (citation omitted); *accord, Stopaquila.org v. Aquila, Inc.*, 180 S.W.3d 24, 39-40 (Mo. App. W.D. 2005) (Commission's issuance of certificate of convenience and necessity for construction of electric power plant did not exempt utility from compliance with county zoning ordinances). To the extent the AAO in some respect limits the financial consequences of the Commission's decision in Evergy's 2018 rate case, that limitation does not constitute an impermissible "collateral attack."

It is also highly significant that, in the 2018 rate case itself, the parties specified that their Stipulation and Agreement would "not preclude any Signatory from proposing an accounting authority order ('AAO') . . . for the recovery of . . . costs associated with" the retirement of the Sibley plant. The Stipulation and Agreement served as part of the basis for the Commission's resolution of the 2018 rate case. Given that the parties agreed that resolution of the 2018 rate case would not preclude any party from later seeking an AAO for Sibley-related costs, we will not read the Commission's decision in the rate case to preclude OPC and the Midwest Energy Consumers Group from seeking that precise relief. *Cf. Kesterson v. State Farm Fire & Cas. Co.*, 242 S.W.3d 712, 717 (Mo. 2008) (although preclusion

21

principles generally prohibit the later assertion of a claim arising out of the same act or transaction involved in an earlier proceeding, an "exception exists when the court in the first action has expressly reserved the plaintiff's right to maintain the second action"; citing and following RESTATEMENT (2D) OF JUDGMENTS § 26(1)(b) (2007)).

Point III is denied.

## III.

In its fourth and final Point, Evergy argues that the Commission erred in establishing an AAO because its decision was explicitly based on the finding that the rates it approved in Evergy's 2018 rate case reflected the costs of operating the Sibley plant, and that it was no longer appropriate for ratepayers to pay for these non-existent expenses. Evergy argues that, while a utility's approved rates are based on financial information from past periods, those rates are predictive and intended to be forward-looking; a utility's rates will never exactly match the utility's actual financial experience during the period the rates are in effect. Evergy argues that the Commission's effort to "fix" the rates set in Evergy's 2018 general rate case to take account of a later event is fundamentally contrary to Missouri's prospective ratemaking principles.

It is well-established that the Public Service Commission may not engage in "retroactive ratemaking." "Retroactive ratemaking is defined as 'the setting of rates which permit a utility to recover past losses or which require it to refund past excess profits collected under a rate that did not perfectly match expenses plus rate-of-return with the rate actually established.'" *State ex rel. Noranda Aluminum, Inc. v. Pub. Serv. Comm'n*, 356 S.W.3d 293, 316–17 (Mo. App. S.D. 2011) (quoting *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 311 S.W.3d 361, 365 (Mo. App. W.D. 2010) (internal quotation omitted)); *see also, State ex rel. Util. Consumers Council of Mo., Inc. v. Pub. Serv. Comm'n,* 585 S.W.2d 41, 58-59 (Mo. 1979).

22

As explained in § II, above, however, this Court has explicitly held that establishment of an AAO does not constitute prohibited retroactive ratemaking. As we explained in *State ex rel. Missouri Gas Energy v. Public Service Commission,* 210 S.W.3d 330 (Mo. App. W.D. 2006), imposition of an AAO does not itself set or modify any utility rate; and even if deferred financial items are considered in a future rate case to set forward-looking rates, "past rates are not being changed so that more money can be collected from services that have already been provided; instead, the past costs are being considered to set rates to be charged in the future." *Id.* at 335-36; *see also, e.g., State ex rel. AG Processing v. Pub. Serv. Comm'n*, 340 S.W.3d 146, 153 (Mo. App. W.D. 2011) ("In prior cases, this Court has rejected claims that measures to recoup previously incurred costs constitute retroactive ratemaking, when the recoupment measures operate prospectively, and do not alter the cost of utility services previously provided to consumers." Citations omitted.).

In the Report and Order imposing the Accounting Authority Order, the Commission referred to the fact that the rates set in Evergy's 2018 rate case reflected costs associated with the operation of the now-retired Sibley plant. This discussion was appropriate, both to explain that the Sibley retirement had not already been considered in setting Evergy's 2018 rates, but also to explain why the Commission considered the financial consequences of the Sibley plant's retirement to be an "extraordinary" event. The fact that utility rates (which will remain in effect for three years) became effective almost simultaneously with a significant event which those rates did not account for, justifies treating the later event as "extraordinary." The Commission's Report and Order does not purport to modify the rates set in the 2018 rate case, either retroactively or even on a going-forward basis. Instead, the Report and Order merely requires that Sibley-related savings be held in a suspense account pending Evergy's next rate case, so that those savings can be considered at that time. This did not constitute prohibited retroactive

23

ratemaking, and was not somehow inconsistent with Missouri's forward-looking rate-setting system.

Point IV is denied.

## Conclusion

The Commission's Report and Order is affirmed.

_____
Alok Ahuja, Judge

All concur.